No. 19,227.

PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO, ET AL. v. COLORADO INTERSTATE GAS COMPANY.

(351 P. [2d] 241)

Decided April 11, 1960.   Rehearing denied May 2, 1960.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Robert E. Nagel, Assistant, for plaintiff in error Public Utilities Commission of Colorado.

Mr. F. T. Henry, Mr. Louis Johnson, for plaintiff in error City of Colorado Springs.

Messrs. Lee, Bryans, Kelly & Stansfield, Mr. Bryant O'Donnell, Mr. Thomas M. Burgess, for plaintiff in error Public Service Company of Colorado.

Messrs. Tippit, Haskell & Welborn, Mr. James W.

BUCHANAN, Messrs. MURRAY, BAKER & WENDELKEN, for plaintiff in error Colorado Fuel and Iron Corporation.

Mr. L. M. POE, Mr. R. C. McHUGH, Messrs. HOLLAND & HART, Mr. JAMES L. WHITE, Mr. JOHN FLEMING KELLY, Mr. JAMES T. MORAN, for defendant in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

ON April 12, 1954, the Public Utilities Commission of the State of Colorado, herein referred to as PUC, on its own motion, entered an ex parte order, amended May 12, 1954, nunc pro tunc as of April 12, 1954, directing *itself* to make an investigation to determine whether the Colorado Interstate Gas Company, herein referred to as Interstate, was conducting its business unlawfully in that it was operating as a public utility without having applied for and obtained from PUC a certificate of public convenience and necessity and without complying with the statutes of the state of Colorado governing public utilities. Said order further provided that Interstate, on or before June 15, 1954, show cause why an order should not be entered by PUC directing it to desist from further activities in Colorado until such time as it might acquire from PUC a certificate of public convenience and necessity.

On June 14, 1954, Interstate filed its answer to the above show cause order and therein sets forth that it is an interstate pipeline company, and that since 1938, at which time the Federal Natural Gas Act was adopted, its activities, except for certain direct, negotiated sales to some industrial consumers, referred to as "direct sales," have been and now are under the exclusive jurisdiction of the Federal Power Commission, herein referred to as FPC, and are by it regulated as to rates and facilities; that in making direct sales it is not a public utility and

in fact its status, that of one engaged in interstate commerce and regulated by FPC, precludes it from acquiring public utility status in making "direct sales."

On June 14, 1954, Citizens Utility Company, herein referred to as Citizens, a PUC certificated gas utility company, serving customers in the Arkansas Valley, intervened in the matter then pending before PUC, and requested permission to show the feasibility of its serving four customers, namely, (1) American Crystal Sugar Company, at Rocky Ford; (2) Holly Sugar Company; at Swink; (3) Atchison, Topeka and Santa Fe Railway Company, at La Junta, and (4) Veterans Administration (Hospital), at Fort Lyon, all located in Citizens' territory and then being served by Interstate through direct sales.

On November 1, 1954, the Colorado Fuel and Iron Company, herein referred to as C. F. & I., intervened for the purpose of offering evidence to establish the fact that Interstate is a public utility and subject to regulation. C. F. & I. expressly stated that it sought no affirmative relief.

On November 8, 1958, hearing was had and testimony taken in support of the contentions of PUC, the two intervenors and Interstate. On January 19, 1959, PUC made extensive findings and concluded that Interstate:

" * * * is and has been a public utility *within the meaning of the definitions of the statutes of the State of Colorado,* and is therefore subject to the jurisdiction of the Public Utilities Commission of the State of Colorado." (Emphasis supplied.)

PUC further ordered Interstate to forthwith apply to PUC for a certificate of public convenience and necessity to operate as a public utility for the sale of gas *not for resale in Colorado,* gas not under the jurisdiction of FPC. Petition for rehearing was filed by Interstate with PUC, and it was by PUC denied on the day filed.

Interstate petitioned the District Court of El Paso County for review by certiorari. At that time the dis-

trict court permitted the City of Colorado Springs and Public Service Company to intervene in the certiorari proceedings. On such review the district court made its own findings of fact and held that Interstate is not and has not been a public utility subject to regulation by PUC.

Plaintiffs in error are here seeking reversal of the judgment of the district court and affirmance of the decision and order of PUC.

■ At the outset we note that the district court in proceedings of this nature is limited to affirming or reversing the decision of the commission and has no authority to make new findings, and our opinion is in no manner predicated on the findings of the district court, nor are they to be considered as an adjudication of the matters therein recited.

There is little, if any, conflict in the evidence, which covered a wide area.

PUC in its decision made a twenty-page *statement* in which it reviewed the evidence and made various and sundry deductions as to the import thereof, and this statement was made a part of the formal *findings*, wherein it was decided that Interstate is and has been a public utility subject to the jurisdiction of PUC.

PUC in its statement correctly sets forth that the evidence shows that Interstate is a natural gas pipeline corporation, transmitting gas from Texas, Oklahoma and Kansas, serving most of the major cities on the eastern slope of Colorado; that gas sales to said cities for resale are subject to the jurisdiction of FPC; that it also sells gas to eleven customers, who use the gas for their own needs and purposes, called direct sales, and which sales are not subject to the jurisdiction of FPC, the sales being made pursuant to individual contracts with each customer. These customers are: (1) The Veterans Hospital at Fort Lyon; (2) The A.T. & S.F. Ry. at La Junta; (3) The Holly Sugar Company, at Swink; (4) The American Crystal Sugar Company, at Rocky Ford; (5) The Colo-

rado Fuel and Iron Company, at Pueblo; (6) The Ideal Cement Company, at Portland; (7) The Pabco plant at Florence; (8) Fountain Valley School near Colorado Springs; (9) Public Service Company, Denver; (10) The City of Colorado Springs, and (11) The City of Trinidad — the last three purchase gas for resale and, in addition, gas for their own use as boiler fuel.

All gas sold by Interstate, direct sales of gas, and gas sold to utilities for resale, is carried in one pipeline system, and all gas is commingled.

PUC further states that C. F. & I., since 1928, has been using gas purchased from Interstate under contract at its steel mills in Pueblo; that in 1953, on expiration of its contract with Interstate, in seeking to negotiate a new contract, Interstate insisted on increasing the price of gas from 12½¢ per mcf, for gas with a heating value of 994 BTU, to 18¢ per mcf, for gas with a heating value of 963 BTU, being a price increase of 67%, amounting to an estimated annual price increase of $786,000.00 in the fuel bill of C. F. & I.; that it would cost C. F. & I. $2,000,000.00 to convert from gas to other types of fuel, and if deprived gas by Interstate it would result in an immediate 40% loss of production of steel, and that the cost of other types of fuel available would be about double the 18¢ cost of gas. PUC also stated that C. F. & I. employs in the Pueblo, Trinidad and Salida areas about 10,000 persons, and that some 100,000 people in the Pueblo area purchase their gas from Pueblo Fuel and Gas Company, a public utility regulated by PUC. The Commission notes that Pueblo Fuel and Gas Company is not an active competitor with Interstate for the C. F. & I. business, though the cost of running a line from its system to the C. F. & I. plant would be relatively small.

Then follows a statement that the Veterans Hospital, A. T. & S. F. Ry., Holly Sugar Company and Crystal Sugar Company are all within the service area of the intervenor, Citizens, and that its predecessor had options

from Interstate in 1930 to acquire these customers, which options were not exercised within the periods of time for which granted, and that in 1950 Citizens sought to exercise the long since expired options, but Interstate refused to sell its facilities and relinquish the customers so served to Citizens, on the ground that during this long period of time the same had become an integral part of Interstate's business.

The statement next deals with sales to one of its oldest direct sales customers, Ideal Cement; and Pabco, its most recent customer. (There was no evidence with reference to Ideal Cement Company and no findings with reference to its dealings with Interstate). PUC states that Plateau Natural Gas Company, a regulated gas company, serving the Florence area, had aggressively, but unsuccessfully, endeavored to obtain the Pabco account away from Interstate.

PUC further states that the prices charged on the direct sales to all customers, except Public Service and Trinidad, was 21¢ and to those two 18¢, the reduced rate to Public Service being because of volume consumed, and the reduction to Trinidad because it constructed and maintained its own thirty-two mile pipeline leading from the main transmission line of Interstate to Trinidad.

Then follows ten pages of argument in which PUC seeks to analyze the effect of this evidence in determining the utility status of Interstate. Interposed is a further factual observation of PUC that Metropolitan Denver has a population of about 800,000; Colorado Springs, 125,000, and Trinidad 15,000, and that these populations are dependent upon electricity generated in large part by gas purchased from Interstate pursuant to contracts dictated by Interstate, the sales not being subject to regulation by FPC.

Much of the balance of the findings of PUC is argument supported by authority leading up to PUC's order directing Interstate to apply for a certificate of public

convenience and necessity authorizing it to operate in Colorado as a public utility. The above findings of fact are well supported by the evidence.

The evidence further shows that since 1928, Interstate has been engaged in the business of acquiring natural gas in Texas and other areas and transporting the same to the eastern slope of Colorado for sale and consumption. Prior to construction of its main pipeline, Interstate negotiated with C. F. & I., looking toward the sale to C. F. & I. of a very large volume of gas to be used in its Pueblo steel mills. From the evidence it appears that obtaining this business from C. F. & I. may well have been the controlling factor as to whether construction of the pipeline was at that time feasible. On or before completion of its pipeline, Interstate entered into a written contract with C. F. & I. for the purchase and sale of specified quantities of gas at negotiated prices set forth in the contract. This contract was for a period of five years and has been renewed periodically with negotiated changes in quantities, prices, the amount of "firm gas" to be purchased, etc. On June 17, 1953, Interstate's contract with C. F. & I. expired and it was not then renewed for the reason that Interstate and C. F. & I. could not agree on prices. There is nothing in the record to indicate that either party ever gave thought to or mention of the fact that Interstate might be a public utility, subject to control by PUC with reference to rates, facilities and financing. The parties dealt with each other at arms length and as corporations engaged in private business.

Interstate's dealings with Colorado Springs began in 1930. The business conducted was of a dual nature: (a) purchase of gas for resale, and (b) purchase of gas for boiler fuel pursuant to a negotiated contract entered into in 1931.

Interstate has, since October 1930, been supplying Ideal Cement Company with gas at its Portland plants. All sales have been pursuant to negotiated contracts.

Ideal, though notified of the proceedings before PUC, made no appearance.

Fountain Valley School, a very small consumer, previous to 1943 was served by Arkansas Natural Gas Company. In 1943 Arkansas ceased operations and since that time Interstate has supplied Fountain Valley's needs on a firm basis. This service is primarily an accommodation by Interstate, which Fountain Valley is happy to have.

May 22, 1929, Interstate entered into contracts with American Crystal Sugar Company to supply its Rocky Ford plant. On November 23, 1929, Interstate entered into a contract with the A. T. & S. F. Ry., to supply its gas needs at La Junta, and on August 19, 1929, Interstate entered into a contract with the United States of America to supply the gas needs of the Veterans Hospital at Fort Lyon, Colorado. Each of these three consumers was in the area being served by Citizens, a Colorado regulated public utility company.

In 1941, Interstate, after some ten years of negotiation, entered into a contract with the Holly Sugar Corporation to supply its gas needs at its Swink, Colorado, plant. This commitment by Interstate involved installation by Interstate of an additional compressor station and other expansions of facilities. Actual service was delayed until 1943 because of the war scarcity of needed expansion materials.

In December 1955, Interstate entered into a contract with Pabco to supply its gas needs at Florence. Pabco is in the area served by Plateau Natural Gas Company, a Colorado regulated public utility, and exercised its choice of obtaining gas from Interstate on a negotiated contract rather than from the regulated utility serving the area.

In 1928 Interstate entered into a contract with Public Service to supply its gas needs for boiler fuel and resale. In 1946 the 1928 contract was amended and extended until February 14, 1967. Public Service used no gas for

boiler fuel until 1947. From 1947 until July 8, 1953, Public Service accounted to Interstate for its boiler fuel gas on the basis of FPC rate schedules. On July 8, 1953, Interstate and Public Service entered into a *year-to-year* contract for purchase of its boiler fuel gas.

In 1931, Interstate entered into a five-year contract with Colorado Springs to supply it with boiler fuel gas; after the five years had expired, the contract was renewed by letters year after year until Colorado Springs began to purchase at the I-1 rate. In 1953 they entered into a new boiler fuel gas contract.

On January 1, 1952, Interstate and the City of Trinidad entered into a boiler fuel contract at three cents less than Colorado Springs and Public Service.

The only question before PUC was whether Interstate was at the time of the hearing on November 8, 1958, a public utility. That is the question now before us. If it is a public utility, it is the duty of PUC to regulate it in conformity with statutory directions.

Though in no manner controlling in resolving this question, it is interesting to note that Interstate had, for twenty-six years, operated in Colorado in supplying gas for sale and for direct use to nine of the eleven customers being served at the time complaint was filed in 1954. These operations were known to PUC. In 1933 proceedings similar to these were initiated against Interstate and resulted in a final decision by PUC to the effect that Interstate was not a public utility. From the date of that decision in 1933 until the commencement of this proceeding in 1954, no steps have been taken by PUC to regulate any of Interstate's activities. It is of further interest that none of Interstate's eleven direct sales customers ever complained to PUC of Interstate's activities. Further, it is noted that only one direct sale customer, C. F. & I., intervened in the proceedings instituted by PUC, and this in spite of the fact that written notice of the time and place of the hearing was given to all eleven direct sale customers and numerous other

persons and firms, including the Denver Post and the Rocky Mountain News. Not until review of PUC's order on certiorari by the district court did Public Service and Colorado Springs seek to intervene, and they were then granted the very dubious right to intervene at that stage of the proceedings.

By reading PUC's twenty-page decision, it is quite apparent that PUC, in concluding that Interstate in its direct sales business is a public utility "within the meaning of the definitions of the statutes of the State of Colorado" and subject to regulation, found inadequate and ignored the statutory definition of public utility and also ignored standards set forth in pronouncements of this court for determining public utility status.

PUC, in its findings, states:

"The most logical procedure is to seek the definition of the statute. This, however, is of little help since the statute merely reiterates the classical phrases used to describe a public utility, viz., 'supplying the public' . . . 'for public uses,' or a corporation declared by law to be 'affected with a public interest.' When one seeks to accord meaning to the terms employed in the statute, viz., 'supplying the public,' 'public uses,' or 'business affected with a public interest,' we are immediately faced with the uncertainty and confusion that has existed from time immemorial in determining what businesses are for a 'public use' or are 'affected with a public interest.' "

PUC then proceeds to show that these tests are without merit and one by one discards them as follows:

The test: *"Affected with a public interest"* —

" * * * the use of these terms tends to become only a convenient expression for describing those businesses, regulation of which has been permitted in the past. * * * "

The "public use" concept is discarded as meaningless. As a test:

"Readiness and willingness coupled with a present

ability to serve the public" meets with disfavor of PUC. Likewise, the concept of "dedication of facilities to serve the public" is frowned upon. PUC, preparatory to pronouncement of its own tests, says:

"The only conclusion that can be reached when one seeks to find meaning in the language in the statutes of Colorado by examining historical precedent is that there have emerged no clear-cut distinctions or identifying characteristics which infallibly divide public utilities from ordinary types of business enterprises. The most that can be said is that there clearly has been a firm, steady and progressive evolution in the climate of opinion in the regulatory field from the days of Lord Chief Justice Hale in *De Portibus Maris,* 1 Hargrove Law Tracts 78, in the 17th century through *Munn v. Illinois,* 94 U.S. 113, 24 L. Ed. 77 (1877) down through the series of decisions that have been enunciated in the 20th century."

PUC promulgated its own test for determining public utility status:

"Thus, it is our conclusion, when we take into consideration the language of the Colorado statutes, the historical significance of the words employed in the light of decisions of other Courts and the common meaning according to these words by both the ordinary and legal lexicographers, that the activities of a company, and the company itself, *must be adjudged to be or not to be a utility on the basis of the totality of the consequences of its activities vis-a-vis the public.* That is to say, we must judge the nature of the service rendered — (1) whether a natural or virtual monopoly, (2) the exorbitance or reasonableness of the charges, (3) the arbitrary control to which its customers may be subjected, (4) whether or not the impact of its service, or the lack thereof, to a class of customers affects the state or community, (5) and whether the services rendered are needful and cannot be surrendered without

obvious general loss and inconvenience." (Emphasis and numbering supplied.)

At the outset we observe that this test is new and novel. Presumably it is adopted to provide a yardstick with which public utility status can be measured and to avoid:

" * * * uncertainty and confusion that has existed from time immemorial in determining what businesses are for a 'public use' or are 'affected with a public interest.' "

This test is made up of several elements. Whether one, a majority, or all of these elements must be present in order to have utility status is not clear. The rule can be of great convenience. To one seeking to apply it there is afforded a flexibility that approaches infinity. As a guide to a business seeking to attain or avoid public utility status, it might well be considered as uncertain and confusing.

We now consider these five elements of PUC's rule:

(1) " * * * natural or virtual monopoly." PUC found that the question of natural monopoly "is nonexistent in this case." It did not decide that Interstate has a virtual monopoly — nor from the record could it so decide. Nine (all except Pabco and Trinidad) of the direct sales customers had used coal for their operations prior to the coming into being of Interstate. Four of those nine are no longer served by Interstate. Three of them had manufactured gas from coal. Public Service and Trinidad are not only equipped to use coal, but are using coal for boiler fuel. There is nothing in the record to indicate whether Ideal Cement is presently equipped to use coal — they did not appear, or offer or request anything. Fountain Valley and Colorado Springs are equipped to use oil in place of gas. Pabco and C. F. & I. are each located within easy reach of gas to meet their require- ments which can be purchased through regulated utili- ties; thus to them is available gas which is twice regu- lated as to price and facilities.

In view of the above, it is understandable that PUC proceeded with extreme caution and said:

"*If* conditions of *virtual monopoly* exist, *we believe* that there is *but little question* that the state has authority to require *a utility in substance,* to be so in form."

The next element in the rule is:

(2) "the exorbitance or reasonableness of the charges."

■ This record is devoid of any testimony touching on the "exorbitance or reasonableness" of charges made by Interstate. True, there is testimony that Interstate has raised its rates materially over a period of twenty-six years, and a partial explanation for this increase is the uncontradicted testimony that Interstate is paying 18¢ for some gas now purchased, whereas in earlier days it purchased some gas for as little as 4¢. Higher prices for commodities and services are not an entirely new or surprising phenomenon. Evidence of a price increase, if it has any value to establish reasonableness of price, is negligible. Hence the finding of utility status cannot be predicated on this element of the rule.

The next test:

(3) "the arbitrary control to which its customers may be subjected."

■ The record does not disclose any arbitrary control by Interstate over its customers. Interstate's control over its customers is limited to its contractual rights. Likewise, each customer had control over Interstate to the extent of the contractual rights and duties of the parties. Neither has any arbitrary control over the other; their rights and duties are all evidenced by negotiated contracts. Interstate has at all times reserved unto itself the right to determine who it will serve and on what basis. Such policy pursued over a period of twenty-six years is contrary to all concepts of a public utility.

The next element in the test is:

(4) "whether or not the impact of its service, or the

lack thereof, to a class of customers affects the state or community."

The test furnishes PUC with a rule of convenience or at least a convenient rule on which to predicate its finding that Interstate is a public utility and to defy anyone to question the correctness of the conclusion. The test can be applied subjectively only. There are no objective criteria for applying the test. How does one measure "the impact of its services?" Is it measured in tons, horsepower, light years, dollars, or millimeters? What is a class of customers? In the case of Interstate it had as customers, a steel mill, a private secondary school, two beet sugar factories, a veterans' hospital, a railroad, a cement manufacturer, a manufacturer of fiber board paper products, a public utility generating and distributing electricity and two municipal power plants. If such a group can be called a class, it is difficult to conceive of any group of eleven customers that do not constitute a class. Certainly, any business seeking to conduct its affairs in such manner as to avoid becoming a public utility under PUC's announced rule could never have any worthwhile opinion as to its then status. Only PUC, applying its own subjective tests, could supply the answer.

The last test is:

"whether the services are needful and cannot be surrendered without obvious general loss and inconvenience."

It can readily be assumed that the services are "needful" — business people are not prone to contract for unneedful services. General loss? What kind of loss? Dollars and cents? By whom? Inconvenience? To whom? Is it meant that Interstate cannot refuse to renew its contractual services because in so doing it would inconvenience its erstwhile customer?

We find no precedent for the rule as announced by PUC. It contains no standards whereby it could be applied with any degree of uniformity; it furnishes no

guide whereby the supplier or the customer could determine the utility or nonutility status of the supplier.

■ PUC's criticism of rules in general use in determining utility status is not without merit. The tests of "public use," "dedication of facilities," "holding forth," "willingness to serve," etc., are not easy of application to any set of facts; they may lead to uncertainty and confusion. Be that as it may, the legislature has spoken and this court has spoken in terms of general usage in public utility parlance.

C.R.S. '53, 115-1-3, provides:

"Public utility defined. The term 'public utility,' when used in articles 1 to 7 of this chapter, includes every * * * pipe line corporation, gas corporation * * * *operating for the purpose of supplying the public* * * * and every corporation, or person now or hereafter declared by law to be *affected with a public interest,* and each thereof, is hereby declared to be a public utility * * * ." (Emphasis supplied.)

Admittedly, this definition of a public utility leaves much to be desired. However, it does say in no uncertain terms that one must be "supplying the public." It is well settled that those words mean *all* of the public within its capacities — it means indiscriminately. In this statute adopted in 1913, now remaining and unchanged for forty-seven years, none of the tests promulgated by PUC appear.

Turning now to the pronouncements of this court:

In *City of Englewood v. Denver,* 123 Colo. 290, 229 P. (2d) 667, this court said:

"We find little need to enter into a lengthy discussion of what is or what is not a public utility, because we would ultimately apply the almost universally accepted test, which summarized is, *that to fall into the class of a public utility, a business or enterprise must be impressed with a public interest and that those engaged in the conduct thereof must hold themselves out as serving or ready to serve all members of the public, who may re-*

*quire it, to the extent of their capacity.* The nature of the service must be such that all members of the public have an enforceable right to demand it. Application of this test to the facts before us reveals that this extraterritorial supply of water is on a nonutility basis, and in so operating, under express statutory authority, it can collect such charges therefor and make such conditions and limitations as it may impose, all without liability of any vested right for a continued sale or leasing thereof." (Emphasis supplied.)

In *Colorado Utilities Corporation v. Public Utilities Commission, et al.,* 99 Colo. 189, 61 P. (2d) 849, this court said:

"Is Moffat Coal Company, under the facts presented, a public utility within the meaning of the Public Utilities Act? * * *

" * * * Moffat Coal Company made no dedication of its property or any part thereof to a public use; *it made no offer, and did not hold itself out, to serve* the public as a public utility as such term is used in the statute above mentioned, but on the contrary steadfastly refused to engage in such operations as would bring it within the public utility classification." (Emphasis supplied.)

In *Parrish v. Public Utilities Commission,* 134 Colo. 192, 301 P. (2d) 343 (1956), this court said:

" * * * There is absolutely no evidence to the effect that Cobb at any time *held himself out to serve the public indiscriminately* on any determinable basis. * * *. We find no contention herein that plaintiffs or *the public can have the use of Cobb's pipeline facilities as a matter of right,* and that they, as well as the public, are in no position to demand the service. *The service to each customer is a permissive service, which creates the distinction between a public utility or a private carrier.* The record discloses no suggestion of a dedication of the pipe line by Cobb to the public service, and, as was determined in *Englewood v. Denver,* supra, *this can never be*

*presumed, but must be supported by evidence of an un-
equivocal intention to make such dedication. \* \* \*.*

\*   \*   \*

*"Under our statute defining public utilities, Cobb's
pipe line operations must be impressed with the public
interest. That it is not so impressed is readily deter-
mined by the fact that plaintiffs here, and the public,
have no right to demand the service. \* \* \*. It is reitera-
tion of the principles laid down in the Englewood case,*
supra, *to say that Cobb and his operations could be class-
ified as a public utility, he must hold himself out as serv-
ing, or ready to serve, all members of the public who
may require it.* We have no testimony to the effect that
Cobb ever made any semblance of an offer to serve the
public." (Emphasis supplied.)

PUC and intervenors cite three cases from other juris-
dictions which deal with the public utility status of na-
tural gas pipelines and which cases they contend should
be persuasive, if not conclusive, of the issues presented
in the case at bar. In each of those cases the statutory
definitions of a public utility and the problems presented
are so at variance with the Colorado statute and the
factual situation before us that we find them of little
value in resolving the questions before us.

The first case, *Industrial Gas Co. v. Public Utilities
Commission of Ohio,* 135 Ohio St. 408, 21 N.E. (2d) 166,
deals with a gas company whose operations are all intra-
state. It was serving nineteen industrial consumers and
twelve private consumers. The Ohio statute defined a
public utility as anyone:

" \* \* \* engaged in the business of supplying natural
gas for lighting \* \* \* to consumers \* \* \*." or:

" \* \* \* in the business of transporting natural gas
through \* \* \* pipes or tubing."

The question before the court was not whether Indus-
trial Gas Company came within the terms of the statute,
but whether the statute was valid. No one could or did

contend that Industrial Gas Company was not a public utility as defined by the Ohio statute.

In *Public Service Commission v. Panhandle Eastern Pipe Line Co.*, 224 Ind. 662, 71 N.E. (2d) 117, the court found that *Panhandle Eastern*, an interstate operator, in supplying gas to numerous customers for resale, and to two direct sale customers, came within the terms of a statute defining a public utility as:

" * * * every corporation that now or hereafter may *own, operate, manage or control* any * * * plant or equipment * * * for the transmission, delivery or furnishing of heat, light, water or power * * * *either directly or indirectly to or for the public* * * * ." (Emphasis supplied.)

· Clearly *Panhandle* owned and controlled facilities for transmitting gas which eventually reached and was used by the "public." It indirectly served the public. Here again we have a statute and definition so at variance with the Colorado statute and definition as to be of no help in the instant case.

In *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission*, 328 Mich. 650, 44 N.E. (2d) 324, the question was not whether *Panhandle* was a utility, but rather the question whether the Public Utilities Commission had jurisdiction over sales of a commodity moving in interstate commerce. Here again we have a statutory definition of a public utility which bears no resemblance to the Colorado statute. The Michigan statute defines a "public utility" as:

. " * * * persons * * * owning or operating in this state equipment or facilities for producing, generating, transmitting * * * gas * * * for the production of light, heat or power to or for the public for consumption."

Interstate relies upon *Mississippi River Fuel Corporation v. Illinois Commerce Commission*, 1 Ill. (2d) 509, 116 N.E. (2d) 394, as supporting its contention that it is not a public utility. The definition contained in the Illinois statute is similar to that contained in the Colo-

rado statute in that each makes service to the public the controlling factor. Illinois uses the words "for public use" whereas Colorado uses the words "operating for the purpose of supplying the public." In holding that Mississippi was not a public utility, the Supreme Court of Illinois, in a five to two decision, stated:

"It seems clear to us that Mississippi has consistently and with great care confined its industrial gas sales to specific and selected customers, and has done no act by which it has given the reasonable impression that it was holding itself out to serve gas to the public, or to any class of the public, generally. * * *.

"Under these circumstances, the circuit court was right in holding that the company's action in selling gas to a limited group of industrial customers cannot properly be characterized as the devotion of its property to 'public use,' within the meaning of the Public Utilities Act of this State."

■ PUC and intervenors further urge that Interstate in the exercise of rights of eminent domain, filing certain certificates with the Secretary of State of Colorado, and obtaining from FPC required certificates of public convenience and necessity, has declared itself to be a public utility and apparently hope that this court will consider such declarations as conclusive on the question of public utility status. PUC has repeatedly rejected the contentions now presented to us with reference to these questions. We reject them. A company does not become a public utility by a declaration, or a hundred declarations, to that effect, nor does it avoid becoming a public utility by disavowing such purpose.

We conclude that Interstate is not a public utility as defined by statute, nor within the meaning of tests laid down by this court in construing said statute.

The judgment of the district court, insofar as it holds that Interstate is not a public utility and that PUC did not regularly pursue its authority and its order is not just or reasonable or in accordance with the evidence, is

affirmed and the cause remanded to the trial court for the purpose of an order directing PUC to vacate and discharge its show cause order directed to Interstate and dated April 12, 1954, as amended May 12, 1954.

MR. JUSTICE MOORE and MR. JUSTICE DOYLE dissent.

MR. CHIEF JUSTICE SUTTON not participating.

MR. JUSTICE DOYLE dissenting:

I respectfully disagree with the reasoning and conclusions of the majority opinion reversing the findings and conclusion of the Public Utilities Commission and holding that Colorado Interstate Gas Company is not operating as a public utility with respect to its so-called direct sales as distinguished from its sales for resale. It seems to me that the question is whether a segment of C.I.G.'s sales can be separated from its overall operation and it can be determined not to be a utility upon the basis of these sales without reference to the rest of its business. This result is achieved by placing undue emphasis upon the test of whether there is a holding out of services to the entire public. This particular test is not a universal determinate of public utility status. It is of value only because it tends to show that the business in question is affected with a public interest. However, the case should not stand or fall upon this question. Instead, it should turn upon the ultimate issue of whether the public interest is affected and in the present case there can be no question but that the operations in question have a profound effect on the public.

The basic fallacy of the test contended for by C.I.G. and adopted by the majority of the Court is shown in an article reported in 28 Harv. L. Rev. 135, 158 entitled *Business Jurisprudence* by Edward A. Adler. He points out that all business holds itself out to the entire public and seeks business generally. The author states:

"But as we have seen, this view is erroneous, and not

supported by the cases upon which it purports to rest. Under a true interpretation of the common law all business is public, and the phrase 'private business' is a contradiction in terms. Whatever is private is not business, and that which is business is not private. Every man engaged in business is engaged in a public profession and a public calling. The parties to business are the merchants on the one hand and the public on the other. The merchant or trader opens his doors into the public street and invites all who pass to enter. By public advertisement and circularizing he solicits patronage from all who read. He extends an invitation or makes a continuing offer to all indifferently. He seeks credit, employs the machinery of credit, and by so doing involves the fortunes of the community at large. He floats his securities in the public market. His good-will, always a principal asset, consists entirely of the likelihood that the people in general will avail themselves of the inducements which he has offered. Reason and authority alike show the soundness of this view."

It could scarcely be contended that the various public callings, such as the inn keeper and the restaurant, are utilities, yet in these areas there is a general holding out of services. What then is the true test of a public utility subject to regulations? The presence of competition in the mentioned areas is the factor which makes the difference. An effort to regulate private business notwithstanding a general holding out would be unconstitutional. This would be considered a confiscation of property. It would follow, therefore, that the true utility test is the furnishing of an essential service (which we have here), together with the factor of monopoly (which is also present). Subjection to regulation is then tolerated under our system for the protection of the general public. The resultant regulation seeks to limit the rate of return of the business involved and at the same time to guarantee this business a reasonable return. It is, of course, repugnant to our system to try to regulate so-

called private business, but I submit that it is equally repugnant to allow a utility, which is furnishing essential service and which has a monopoly, to go unregulated. Such a business cannot be depended upon to exercise restraint in exacting a fair price for its commodity.

1. *The question whether the operations here in issue are within the terms of the relevant statutory provision.*

The term "public utility" is defined in C.R.S. '53, 115-1-3, which reads as follows:

*Public utility defined.*—The term 'public utility,' when used in articles 1 to 7 of this chapter, includes every common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, person or municipality operating for the purpose of supplying the public for domestic, mechanical or public uses, and every corporation, or person now or hereafter declared by law to be affected with a public interest, and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of articles 1 to 7 of this chapter. Nothing in articles 1 to 7 of this chapter shall be construed to apply to irrigation systems, the chief or principal business of which is to supply water for the purpose of irrigation."

The clause which the majority of the Court emphasized is "operating for the purpose of supplying the public." Omitted from the quoted statute in the majority opinion are the words "pipe line corporation" and "gas corporation." In deciding the present question, however, it is believed that these words cannot be omitted since they evidence the legislative intent to subject to regulation the type of service company which has been traditionally regarded as a utility subject to regulation. This arises from the fact that normally competition in this area of special activity is non-existent and for that reason price control is necessary for the protection of the public. Such corporations provide basic and necessary

services and the public interest is served by allowing them to operate as regulated monopolies.

Having specifically mentioned particular types of business which are regarded as public utilities, the statute sets up other broad general standards, including the one here construed by the majority, "operating for the purpose of supplying the public," together with a third standard, "affected with a public interest." It seems to me that the language of the statute is amply comprehensive to encompass any type of business which is and has been traditionally regarded as a public utility. This Court, in *Public Utility Commission v. City of Loveland,* 87 Colo. 556, 289 Pac. 1090, recognized that the General Assembly sought to confer on the Commission broad powers to regulate all public utilities. It was there said:

" * * * To approve of the court's findings and decree would be upon our part a virtual repeal of the essential provisions of the Public Utilities Statute. It should be borne in mind in considering cases under this statute that it was clearly the intention of our General Assembly to give to the Utilities Commission complete control over public utilities so far as that could be done under existing constitutional limitations. * * * "

The general standards mentioned above, namely, "operating for the purpose of supplying the public," and "affected with a public interest" have been construed by the courts to include the type of activity presently in issue. In the leading case of *Munn v. Illinois,* 94 U.S. 113, 24 L.Ed. 77, decided in 1876, which is generally regarded as the definitive decision on public utility regulation, the Supreme Court said:

" * * * Property does become clothed with a public interest when it is used in a manner to make it of public consequence and affect the community at large."

The question in the *Munn* case was whether grain elevators could be regarded as public utilities subject to regulation and the Supreme Court held that they were affected with a public interest. This decision was based

upon the fact of necessity of the service, together with the existence of a virtual monopoly.

In the case of *Public Service Commission v. Panhandle Eastern Pipeline Company*, 224 Ind. 662, 71 N.E. (2d) 117, the Court rejected a contention similar to that which is being urged in the case at bar and held segregation of direct sales to be impossible. There it was said:

"This part of its business (direct sales) and its interstate transportation and its sales to local distributing utilities, are so integrated that in any practical consideration of the state's right to regulate direct sales to consumers, that activity must be appraised as a part of its entire business in Indiana. Its rights and duties with reference to such direct sales must be determined in the light of its over-all character in the State of Indiana."

See also *Industrial Gas Company v. Public Utilities Commission of Ohio*, 135 Ohio St. 408, 21 N.E. (2d) 166 and *Panhandle Eastern Pipe Line Company v. Michigan Public Service Commission*, 328 Mich. 650, 44 N.W. (2d) 324. In the latter case, as in the case at bar, the pipeline company was seeking to avoid regulation with respect to certain select customers. The Michigan Court held it to be a utility. In *Public Service Commission v. Panhandle*, supra, the Indiana Court said (224 Ind. 685):

"The bottom question on this phase of the case is whether the appellee is furnishing gas in Indiana directly or indirectly to or for the public. Admittedly it is selling gas in Indiana indirectly to and for the public through distributing companies and that makes it a public utility under the Indiana statute, subject to regulation and control by the Indiana Public Service Commission. Also admittedly it is selling and proposing to sell gas directly to consumers within the state. This part of its business and its interstate transportation and its sale to local distributing utilities are so integrated that in any practical consideration of the state's right to regulate direct sales to consumers that activity must be appraised as a part of its entire business in Indiana. Its

rights and duties, with reference to such direct sales, must be determined in the light of its over-all character in the State of Indiana. It will compete with local activities in soliciting industrial business and will be in position to discriminate in its service and in its rates and in its regulations. This freedom is inconsistent with all concepts of the duties and obligations of a person or corporation engaged in such business."

In view of basic concepts of public utility regulation and in view of the broad interpretations adopted by the courts respecting similar statutes, it seems clear that the operations of C.I.G. here in question are included within the statute. The contention of C.I.G. adopted in whole by the majority of the Court that its business cannot be considered as an integrated entirety; that the Commission is required to isolate the particular sales and judge its susceptibility to regulation as a public utility from this limited vantage strikes me as a shallow, superficial interpretation of the statute, and one which is out of harmony with fundamental principles.

2. *The question whether the direct sales which are here in question are subject to regulation based upon an analysis of this part only of C.I.G.'s business.*

It should be first noted that C.I.G. is not a small utility. During the 12 month period ending April 30, 1955, it transported and sold some 217 billion cubic feet of natural gas for a revenue of approximately $34,000,000. In Colorado alone it sold 118,500,000,000 cubic feet of natural gas for a revenue of $25,222,663. Approximately 70% of its sales are made to municipalities and regulated public utilities for distribution to domestic, industrial and commercial users. The remaining 30% of its sales are to consumers for their own use and consumption, either domestic, commercial or industrial. These direct sales are not subject to regulation by the Federal Power Commission under the Natural Gas Act. They have been held to be of local and not interstate concern. *Panhandle Eastern Pipe Line Company v. Public Service*

*Commission of Indiana,* 332 U.S. 507, 68 S. Ct. 190, 92 L.Ed. 128. As a matter of actual practice there is no effort by C.I.G. to segregate these direct sales from those which are regulated by the Federal Power Commission. All the gas is commingled and transported through C.I.G.'s transmission lines and pumping stations. The City of Colorado Springs, the City of Trinidad and the Public Service Company of Colorado purchase gas from C.I.G. for resale and distribution and these purchases are regulated by the Federal Power Commission. These same customers also purchase gas for use as boiler fuel for the generation of electricity, which in turn is distributed to the people subject to regulation, and these purchases, the C.I.G. claims, are free of regulation.

Other so-called direct sales include the following:' Colorado Fuel and Iron Corporation, which purchases approximately 10,000,000,000 cubic feet per year at a cost of $2,400,000; Ideal Cement Company, which purchases 3,262,000,000 cubic feet per year; Pabco Products, Inc., American Crystal Sugar Company, Holly Sugar Company, Santa Fe R. R., United States Veterans' Hospital and Fountain Valley School.

The evidence indicates that C.I.G. sometimes pursues an aggressive policy with respect to its direct sales customers. For example, the City of Colorado Springs and the Public Service Company of Colorado formerly supplied their own needs for boiler fuel for generation of electricity from gas which they purchased under Federal Power Commission regulation.

However, C.I.G. put a stop to this and directed Public Service and Colorado Springs to enter into direct sales contracts with it. This resulted in substantial rate increases and, of course, a further result was an increase in the cost of electricity so generated to the ultimate consumer.

Another example of C.I.G.'s aggressiveness with respect to direct sales is the Pabco Products incident. A local distributor sought to serve this account, but not-

withstanding this, C.I.G. applied to the Federal Power Commission for a certificate to extend its facilities so as to be able to serve Pabco. Notwithstanding protests by the distributing company, C.I.G. obtained the certificate and also the customer. An effort was also made by C.I.G. to serve the Air Force Academy which is located contiguous to the City of Colorado Springs; C.I.G. ceased its negotiations because of the adverse effect that this might have on the present proceedings.

The rates to C.I.G.'s direct sales customers have increased markedly in the last several years. The charge to Colorado Springs increased 50% following the shift to direct sales in 1953. The Colorado Fuel and Iron Company's rates have been increased 67%, amounting to $786,000 annually. It is noteworthy that these direct sales contracts provide that there is no obligation on the part of C.I.G. to continue service in the absence of agreement on prices. In 1953 when Colorado Fuel and Iron Company attempted to resist the 67% price increase, it received notice in writing from C.I.G. that if the rate was not accepted deliveries would be discontinued as of a particular date. An official of the City of Trinidad testified that there was no negotiation with C.I.G. as to price, that the city was simply told what it would have to pay.

It seems apparent from the evidence that C.I.G. has a virtual monopoly in the eastern area of Colorado, particularly in the more densely populated sections thereof, and it also seems clear from the facts adduced before the Commission that the direct sales customers are a substantial segment of the public. See *Davis v. People ex rel Public Utilities Commission,* 79 Colo. 642, 247 Pac. 801, wherein it is said:

"A service may effect (sic) 'so considerable a fraction of the public that it is public in the same sense in which any other may be called so . . . the public does not mean everybody all the time.' "

The argument that C.I.G. does not have a monopoly because other fuels are available is not persuasive because the so-called other fuels are not under present conditions competitive. Moreover, practical considerations make these customers virtual captives of C.I.G. It would cost Colorado Fuel and Iron Company, for example, some $2,000,000 to convert its facilities to the use of other fuel. If this is competition, it is theoretic and not actual competition; consequently the effort to show non-monopoly from these facts is unpersuasive.

It is noteworthy that the Commission found as a fact that other types of fuel were not competitive. The finding on this point is quoted as follows:

"There are other types of fuel available to C.F. & I. if natural gas were not available. Oil, at a cost of 41c for the equivalent BTU of natural gas, and coal at 35.1c could be purchased if a sufficient source of coal was available. The cost of coal was vigorously disputed by Interstate, it being contended that that cost was substantially lower. However, some of the testimony offered by Interstate on this question cannot be accorded the dignity of evidence having probative value, and in view of the background, experience and duties of the expert testifying for C.F. & I. as to the cost of coal, we are compelled to accept his testimony of 35.1c as being the more accurate."

The above finding is binding on this Court, so that we are not free to conclude that C.I.G. does not have a monopoly by reason of the existence of competing fuels. My concept of competing fuel would be one which is available at a price and upon a basis which could be regarded as practical as compared with that of natural gas. Certainly it is not competitive when the price is substantially higher and the cost of changeover prohibitive. These facts appear to me as furnishing a basis for concluding the existence of a practical monopoly and as showing beyond question the need for regulation in the public interest. On this question, whether there is equal-

ity of bargaining status as between C.I.G. and its direct sales customers, the Commision observed:

"It is patently obvious that this Commission was not provided with the detailed history and full facts of at least the boiler fuel contracts. Rather than the Public Service Company of Colorado, Colorado Springs and Trinidad, being the anxious and needy supplicants for boiler fuel service, it would appear from their position to serve themselves, previous service to themselves and common sense, that these direct sale customers were the unwilling purchasers of unregulated fuel, terminable at the will of the supplier, at a cost controlled only by the much higher cost of other fuels, which can hardly be classed as competitive."

This also strikes me as a circumstance indicating the existence of a monopoly and the non-existence of a free competitive market.

There are other facts in the record and findings which show that C.I.G. is a utility which should be regulated. The tremendous impact on the affected communities is there shown. Pueblo, Trinidad and Colorado Springs are large communities. The Colorado Fuel and Iron Company employs over 10,000 people. A private corporation should not have the power of life and death over entire communities and industries. It should not have the power to turn the gas on and off in its unrestrained discretion. Here is tremendous potential for harm to the citizenry of the communities involved. The citizens of Denver are similarly affected. It is shown that C.I.G. ordered Public Service Company to cease supplying itself and required Public Service to enter into a contract with it. Is the public affected by this? It is, of course, clear that if Public Service is required to pay a substantially higher rate for boiler fuel, it in turn will have to seek an increase in the charges which it exacts for electricity. Regulation of electrical rates becomes a mockery if the fuel used to generate the electricity is sold on a monopolistic non-regulated market. The Commission

took all of this into consideration in concluding that the proper test is whether a virtual monopoly exists.

"The question of a natural monopoly is non-existent in the instant case. We do feel, however, that the possibility of a virtual monopoly must be dealt with. It is our conclusion that if a business is a virtual monopoly, it, in effect, renders the business public or for a public use. There is a question of the situation of the public with respect to the business. Competition from a legal point of view may be possible, but from an economic point of view, improbable. Virtual monopoly may exist because of cost of plant and the large scale on which services are performed, the inadequacies of available substitutes and the dependence of the services rendered upon other activities. It is not the nature of the undertaking itself but the circumstances in which it is carried on. If conditions of virtual monopoly exist, we believe there is but little question that the state has authority to require a utility in substance, to be so in form. This was recognized by Mr. Justice Holmes in the *Pipeline cases.* 234 U.S. 548."

The Commission was also articulate in its final conclusions:

"The conclusion is inescapable that the respondent in its activities constitutes a virtual monopoly. Its customers are subject to the arbitrary control of the respondent, both as to price and as to service. In the impact of the respondent's services or the lack of said services to any class of customers or to any customers, whether it be a manufacturing plant, Colorado Fuel & Iron Corporation, or the electric generating plants of Public Service Company, or the municipalities, they would have grave and serious consequences for a large segment of the population of this state.

"In so finding, we do not state that these arbitrary powers have been in reality exercised by the respondent. We do not state that the prices charged are unreasonable, nor do we state that the respondent has in any way

conducted itself in an unreasonable manner. All of those matters would have to be subject to other specific hearings. We simply assert that under the present method of operation such a power is vested in the respondent and this power is not canalized within banks that may keep it from overflowing. This power is unconfined and vagrant, subject, primarily, to the good will of the respondent. We believe that such a power must be subject to reasonable and constitutional processes and the police power of the people of the State of Colorado."

It seems to me that the facts disclosed in the present record fully justify the Commission in arriving at its conclusion that the subject matter here involved is clearly within the accepted definitions. It is hard to conceive of a fact situation which would more clearly establish the presence of public utility status subject to regulation. It is hard to conceive of facts which would show, not only the effect, but the tremendous impact upon the public interest, than do those present here.

A final frightening aspect of this case is the possibility that C.I.G. will find the present technique a convenient one for escaping regulation altogether. Once it obtains a ruling from this Court that its direct sales are free from regulation, what is to prevent it from immediately adopting a broad non-competitive policy with respect to acquiring new customers? This was expressed by the Supreme Court of Indiana in *Public Service Commission v. Panhandle Eastern Pipeline Company,* supra. (224 Ind. 662, 668) as follows:

"It appears that in like manner, as appellee begins service direct to other large industrial consumers, it will, in most, if not all, instances supplant service by local public utility companies. These local distribution utilities have expressed alarm that taking away their large customers, thereby decimating the volume of their sales, will cripple their ability to serve domestic and small commercial and industrial consumers at fair rates."

See also *Panhandle Eastern Pipe Line Company v. Michigan Public Service Commission,* supra, wherein the same idea was expressed by the Michigan Court:

"Obviously, Panhandle seeks to skim the cream off the local market for natural gas in the municipality where the intervening defendant now provides such services, by selling gas to Ford Motor Company and other industrial users, without regard to the public convenience and necessity for natural gas by other users in the Detroit area, particularly for domestic use. If Panhandle is free to compete at will for such local markets, and take the cream of the business, any other utility providing the same service in the same area might be forced to obtain higher rates for its services when it must obtain its natural gas from Panhandle, and thus would face a distinct disadvantage. The right to exclude such competition, where the general public convenience and necessities so require, has been delegated by the legislature to the Michigan public service commission, after a proper hearing and upon a proper showing of the facts and the necessities, to determine whether Panhandle, by selling natural gas direct to industrial users in Detroit, would thus serve the public convenience and the necessities of users of natural gas in that area where Panhandle now claims the absolute right to engage in such service."

It seems to me that the Commission properly placed the emphasis where it belongs. It found and concluded that C.I.G. has a virtual monopoly with respect to an essential service and further found that its conduct was such as to require regulation. The Commission gave a proper construction to the statute, a construction which gives effect to the legal terms used therein in accordance with our basic notions as to what constitutes a public utility. The majority opinion, on the other hand, has given the statute a strained, unnatural construction; one which is out of harmony with fundamental public utility precepts, and does violence to the public interest.

For the reasons stated, I would reverse the judgment

of the district court, and affirm the findings and conclusion of the Public Utilities Commission.

Mr. Justice Moore joins in this dissent.