**NORTHERN NATURAL GAS COMPA-NY, operating as Peoples Natural Gas Division, Appellant,**

v.

**MINNESOTA PUBLIC SERVICE COM-MISSION et al., Respondents,**

**Eveleth Taconite Company, Respondent,**

**Reserve Mining Company, Respondent,**

**Erie Mining Company, Respondent,**

**Hanna Mining Company, Respondent,**

**United States Steel Corporation, Respondent.**

**No. 50318.**

Supreme Court of Minnesota.

May 16, 1980.

Thomas N. Wright, Omaha, Neb., Oppenheimer, Wolff, Foster, Shepard & Donnelly and Elmer R. Trousdale, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., Jean E. Heilman, Asst. Atty. Gen., and Rodney A. Wilson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Service Comm.

Covington & Burling and Nicholas W. Fels, Washington, D. C., Steer, Strauss, White & Tobias and James Ryan, Cincinnati, Ohio for Reserve Mining Co.

Mackall, Crounse & Moore, Minneapolis, Frank L. Hartman, Cleveland, Ohio, and Robert S. Lee, Minneapolis for Erie Mining Co.

Stuart Theis, Cleveland, Ohio, for Hanna Mining Co.

Kenneth R. Pepperney, Pittsburgh, Pa., Benjamin Blacik, Duluth, for United States Steel Corp.

Heard before ROGOSHESKE, TODD, and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

On November 2, 1976, Erie Mining Company sent a letter to the Minnesota Public Service Commission expressing concern that Northern Natural Gas Company, operating as Peoples Natural Gas Division (hereafter "Peoples Division" or "Northern") was discriminating against Erie in its method of implementing its natural gas curtailment plan. The commission, on its own motion, issued an order to show cause to Peoples Division to demonstrate why the commission should not regulate certain rates and other aspects of the curtailment plan. Erie filed a formal complaint against Peoples Division and also petitioned and was allowed to intervene in the order to show cause. Eveleth Taconite Company, Reserve Mining Company, Hanna Mining Company and United States Steel Corporation were similarly allowed to intervene.

A hearing examiner from the State Office of Hearing Examiners held hearings on the matter and issued a recommended report which stated, *inter alia*, that the Public Service Commission could regulate Northern's direct sale contract rates. The Public Service Commission adopted as its own the examiner's findings and conclusions on the issue of PSC jurisdiction to regulate direct sale contract rates. Northern appealed to the Second Judicial District Court, which affirmed the PSC order in all respects in an order dated June 25, 1979. Northern appealed from that order on July 10, 1979. We affirm.

The sole issue in this case is whether the Minnesota Public Service Commission has jurisdiction under the Minnesota Public Utility Act to regulate retail sales of natural gas made directly from an interstate pipeline to Minnesota "direct sale" customers comprised of 34 large industries and approximately 2,100 farm taps.

The facts in this case are not in dispute. Peoples Natural Gas Division of Northern Natural Gas Company makes two basic types of retail sales of natural gas. In some 86 Minnesota communities Peoples Division operates "town plant distribution systems." These systems consist of a gas pipeline network which receives its supply from Northern's interstate pipelines and then fans out to serve homes and businesses within a town. Northern concedes that the Public Service Commission has the authority to regulate these sales.

Peoples Division also makes retail sales to "direct sale" customers who receive natural gas directly from the interstate pipeline. These sales fall into two further categories: (a) direct sales to farmers over or near whose land the main pipeline extends; (b) direct sales to industries which require large volumes of gas. There are approximately 2,100 of these farm taps and 34 industrial taps. In both cases, the fuel line up to the interstate pipeline is owned by the customer, but Peoples Division owns certain odorizers and telemetry equipment used in servicing these customers and performs metering and billing for the customers.

In the mid-1960's when Northern was extending its pipelines north of Duluth, it actively sought to serve large industrial customers such as Erie Mining Company on a direct sale basis. However, the Federal Power Commission (now the Federal Energy Regulatory Commission) has not allowed Northern to add any more direct sale customers since the current shortfall in gas supply began except for some farm taps which are called for in easements granted when the pipeline was built.

At the outset, there is no dispute that the regulation of rates for direct sales of natural gas is a matter within the state as opposed to the federal regulatory power. The United States Supreme Court has held that Congress, in passing the Natural Gas Act, intentionally left direct retail sales to state regulation. *Panhandle Eastern Pipeline Co. v. Public Service Commission*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947). Congress meant to create a comprehensive regulatory scheme by regulating wholesale gas sales, and therefore "[t]he attractive gap which appellant has envisioned in the coordinate schemes of regulation is a mirage." *Id.* at 524, 68 S.Ct. at 199. The court further held that the sale and distribution of gas to local consumers made by one engaged in interstate commerce is essentially local and therefore subject to state regulation without infringing on the commerce clause of the United States Constitution. *Panhandle Eastern Pipeline Co. v. Michigan Public Service Commission*, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951). More recently, the court reaffirmed these early cases by holding that the Federal Power Commission has power to regulate the volume of gas sold to direct sale customers (*i.e.*, the amount of curtailment), but is precluded from regulating rates for those customers. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

Thus, the issue in this case is not whether Minnesota can regulate direct sales, but rather whether the Minnesota legislature has given the Public Service Commission the power to do so. The resolution of this issue depends on whether or not Northern is a "public utility" within the meaning of the Public Utility Act, Chapter 216B of the Minnesota statutes, when it makes direct retail sales of natural gas.

The definition of "public utility" in chapter 216B is:

"Public utility" means persons, corporations or other legal entities, their lessees, trustees, and receivers, now or hereafter operating, maintaining, or controlling in this state equipment or facilities for furnishing at retail natural, manufactured or mixed gas or electric service *to or for the public* or engaged in the production and

retail sale thereof but does not include a municipality or a cooperative electric association, organized under the provisions of . . . chapter 308 producing or furnishing natural, manufactured or mixed gas or electric service. Except as otherwise provided, the provisions of Laws 1974, Chapter 429 shall not be applicable to any sale of natural gas or electricity by a public utility to another public utility for resale. No person shall be deemed to be a public utility if it presently furnishes its services only to tenants in buildings owned, leased or operated by such person. No person shall be deemed to be a public utility if it presently furnishes service to occupants of a mobile home or trailer park owned, leased, or operated by such person. No person shall be deemed to be a public utility if it presently produces or furnishes service to less than 25 persons.

Minn.Stat. § 216B.02, subd. 4 (1978) (emphasis added). The operative language in this case is "to or for the public." [1]

Northern's argument is that supplying natural gas to a small class of customers is not "to or for the public." Northern cites a Colorado case which finds the "almost universally accepted test" of what is a public utility to be that:

[A] business or enterprise must be impressed with a public interest and that those engaged in the conduct thereof must hold themselves out as serving or ready to serve all members of the public, who may require it, to the extent of their capacity. The nature of the service must be such that all members of the public have an enforceable right to demand it.

*City of Englewood v. City & County of Denver*, 123 Colo. 290, 229 P.2d 667, 673 (1951). Direct sale customers, Northern argues, have no enforceable right to demand service, especially since the FPC stopped allowing new direct sale hook-ups.

While *City of Englewood* dealt with water service, Northern cites three cases dealing with direct sales of natural gas which held that activity not to be a public utility. In *Mississippi River Fuel Corp. v. Illinois Commerce Commission*, 1 Ill.2d 509, 116 N.E.2d 394 (1953), the corporation essentially sold gas on a wholesale basis, but supplied 23 industries directly. The majority found the corporation not to be a public utility because it had never held itself out to the public generally, but there were two dissenters. In *Public Utilities Commission v. Colorado Interstate Gas Co.*, 142 Colo. 361, 351 P.2d 241 (1960), a company making primarily sales for resale plus 11 direct sales was held not to be a public utility. Again there were two dissenters who argued that such large consumers indirectly comprise a large portion of the public. In *Wilhite v. Public Service Commission*, 150 W.Va. 747, 149 S.E.2d 273 (1966), a small pipeline company serving two industrial concerns was held not to be a public utility.

Under the Minnesota statute, however, it is likely that these cases would have reached the same result. A pipeline serving only two customers as in *Wilhite* would fall under the exception that "[n]o person shall be deemed to be a public utility if it presently produces or furnishes service to less than 25 persons." Minn.Stat. § 216B.02, subd. 4 (1978). In both *Mississippi River Fuel Corp.* and *Colorado Interstate Gas Co.*, the primary business of selling natural gas for resale would fall under a Minnesota exception, and the remaining direct sales were to fewer than 25 persons.

In this case, Northern sells gas directly to 34 industrial consumers and approximately 2,100 farm taps. These are obviously more than 25 persons, and Northern does not claim to fall within any of the other statutory exceptions for municipalities, cooperative electric associations, sales for resale,

---

1. Prior to amendment in 1978, the pertinent part of this statute read "to or for the public or its members." *See* 1978 Minn.Laws, ch. 795, § 2. The amendment struck the "or its members" language and added an exception for cooperative electric associations. Apparently "or its members" referred to members of a cooperative, and it is therefore unlikely that by striking the language the legislature meant to express any intention as to a case such as this one.

sales to tenants, or sales to mobile home occupants. Therefore, under the rules of statutory construction, Northern falls within the definition of public utility because "[e]xceptions expressed in a law shall be construed to exclude all others." Minn. Stat. § 645.19 (1978).

Under a statute much more restrictive than section 216B.02, subd. 4, the Iowa court held Northern's Iowa direct sale operations to be regulable as a public utility. *Iowa State Commerce Commission v. Northern Natural Gas Co.*, 161 N.W.2d 111 (Iowa 1968). Northern had town plant systems in Iowa which were state regulated and not in dispute and 5,000 farm tap customers and 93 nondomestic retail customers which were the subject of the lawsuit. The Iowa definition of "public utility" included any person or corporation "owning or operating any facilities for * * * [f]urnishing gas by piped distribution system * * to the public for compensation." *Id.* at 113. Although there were three dissenters, the majority held that "to the public" means "sales to sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination." *Id.* at 115. The court specifically rejected the rigid test that the nature of the service must be such that all members of the public must have an enforceable right to demand it. *Id.* at 116.

Several other states have found direct sales to fall within the definition of public utility. The cases include: *Cities Service Gas Co. v. State Corporation Commission*, 222 Kan. 598, 567 P.2d 1343 (1977); *Public Service Commission v. Panhandle Eastern Pipeline Co.*, 224 Ind. 662, 71 N.E.2d 117, *aff'd*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); *Industrial Gas Co. v. Public Utilities Commission*, 135 Ohio St. 408, 21 N.E.2d 166 (1939).

In *In re Condemnation by Dairyland Power Cooperative*, 248 Minn. 556, 82 N.W.2d 56 (1957), we held an electric cooperative to be a public utility even though it provided service to its members only. While the holding of the case has been superceded by the 1978 amendment to section 216B.02, subd. 4, the reasoning is still valid. We refused to adopt a rigid test, holding that what constitutes a public utility depends upon the particular facts in each case and emphasizing the public character of electrical service. We considered merely as one factor that the cooperative had a policy of extending electrical service to all persons within its service area without discrimination.

In this case, natural gas service is certainly a traditional area of public concern and government regulation. As in the *Iowa State Commerce Commission* case, 34 large-volume industrial consumers and 2,100 farm tap customers comprise a significant portion of the public. Although Northern is no longer adding large direct sale customers, it did once solicit the large industries in northern Minnesota and would presumably continue to do so if it had a choice. The fact that new customers are no longer sought out is due to the FPC prohibition against such customers which resulted from the decline in supplies of natural gas. This very shortfall in natural gas supplies makes a rigid "right of the public to demand service" test extremely unrealistic; if, for example, residential customers were not allowed to hook up to a town plant system due to lack of supply, would the company lose its status as a public utility? As the PSC points out, Minnesota residents in Eagan have in fact been denied natural gas service by Peoples Division of Northern Natural Gas with PSC approval. Surely this occurrence does not change the status of Peoples Division as a public utility while functioning as a town plant distributor.

The legislature has stated the purpose of the Minnesota Public Utility Act as follows:

It is hereby declared to be in the public interest that public utilities be regulated as hereinafter provided in order to provide the retail consumers of natural gas and electric service in this state with adequate and reliable services at reasonable rates, consistent with the financial and economic requirements of public utilities and their need to construct facilities to provide such services or to otherwise

obtain energy supplies, to avoid unnecessary duplication of facilities which increase the cost of service to the consumer and to minimize disputes between public utilities which may result in inconvenience or diminish efficiency in service to the consumers. Because municipal utilities are presently effectively regulated by the residents of the municipalities which own and operate them, and cooperative electric associations are presently effectively regulated and controlled by the membership under the provisions of chapter 308, it is deemed unnecessary to subject such utilities to regulation under this chapter except as specifically provided herein.

Minn.Stat. § 216B.01 (1978).

In view of the broad public purpose set out above and the specific language of section 216B.02, subd. 4, discussed previously in this opinion, we reject the "right of the public to demand service" test advocated by Northern. In the absence of a showing that an entity falls within an exception listed in section 216B.02, subd. 4, an entity which furnishes natural gas at retail is a public utility. We hold that Northern, while furnishing natural gas at retail to these direct sale customers, falls within the definition of "public utility" and may therefore be regulated by the Public Service Commission. The trial court and the commission must be affirmed.

Affirmed.