MARVIN E. WILHITE, *et al., etc.* AND
WILHITE-MCGAHEE PIPE LINE, INC., *a Corporation*

*v.*

PUBLIC SERVICE COMMISION OF WEST VIRGINIA AND
CONSOLIDATED GAS SUPPLY CORPORATION, *a Corporation, etc.*

(No. 12562)

Submitted May 12, 1966.          Decided July 15, 1966.

748

*Homer W. Hanna, Jr., T. D. Kauffelt,* for petitioners.

*Robert Hart, Jr., Charles E. Anderson, Thomas A. White, David E. Weatherwax, Harold M. Garrett,* for respondents.

*Jackson, Kelly, Holt & O'Farrell, William T. O'Farrell, W. J. Carter,* amicus curiae on behalf of Union Carbide Corp.

*Steptoe & Johnson, W. F. Wunschel, W. F. Swanson, Jr.,* amicus curiae on behalf of Pittsburgh Plate Glass Co.

BERRY, JUDGE:

This case is before the Court for a suspension and review of the final order entered by the Public Service Commission of West Virginia of January 6, 1966 and the order of January 26, 1966, denying rehearing and reconsideration of the January 6, 1966 order, which reads as follows: "The defendant, Wilhite-McGahee Pipeline, Inc., a corporation, is hereby ordered to cease and desist from the construction and operation of a gas pipeline to furnish gas, and from the sale of such gas, to industrial customers in the Clarksburg area of Harrison County, West Virginia, unless and until it shall have applied for and received a certificate of public convenience and necessity from this Commission authorizing such construction, operation and sale." Upon petition of Wilhite-McGahee Pipe-Line, Inc., a corporation, and Marvin E. Wilhite and Francis M. McGahee, the case was docketed on March 14, 1966, and was heard and submitted on May 12, 1966, at the April Special 1966 Term of this Court on arguments and briefs.

Marvin Wilhite and Francis M. McGahee, individual parties herein, originally composed a partnership which appears to have been converted into a corporation at some date during the pendency of these proceedings, but is still referred to in most of the papers by its original name. The

partnership, and later the corporation, was established for the purpose of procuring natural gas by drilling its own wells, by collecting gas from other wells and by operating wells in conjunction with persons not members of the partnership or corporation. In addition to the procuring of gas Wilhite and McGahee also organized a corporation called Wilhite-McGahee Pipe-Line, Inc., the purpose of which was stated to be to buy the gas and furnish it to two customers in the Clarksburg area. Inasmuch as the names are used interchangeably in the various papers and the persons are engaged in similar matters they will be ordinarily referred to as "Wilhite". The other major party to this proceeding is the Consolidated Gas Supply Corporation, a corporation, which was formerly known as the Hope Natural Gas Company, and for the sake of brevity will be referred to hereinafter as "Consolidated" or "Hope".

The proceeding which led up to the matter before this Court was actually begun in another form by Wilhite when it submitted to the Public Service Commission of West Virginia on March 30, 1965, a petition to determine if Wilhite was subject to the jurisdiction of the Commission with reference to a proposed pipeline project. The proposal submitted by Wilhite was to originate a natural gas line in the Rangoon area of Union District in Barbour County, West Virginia, and to furnish gas to two industrial plants and to convey that gas by a 10-inch natural gas pipeline through portions of Barbour County and Harrison County, West Virginia, to Nutter Fort and Anmoore, West Virginia, near the outskirts of the City of Clarksburg, at the terminus of which the line was to furnish gas to the Pittsburgh Plate Glass Company which is actually at Stonewood, adjacent to Nutter Fort, and to the National Carbon Company at Anmoore which is now known as Union Carbide Corporation.

The proposal further stated: "The name of other public utilities with whom the proposed construction may compete: Hope Natural Gas Company, Cumberland and Allegheny Gas Company, and Delaware Gas Company." It appears from the transcript of the evidence taken at the hearing that the Delaware Gas Company does also furnish gas to cus-

tomers of Consolidated and is not a public utility and no complaint has ever been filed against it to have it declared as such. No further information seems to be in the record concerning the Delaware Gas Company and it appears not to have seriously affected Consolidated. Therefore, Hope, a certificated public utility which serves the Clarksburg area, has taken such action as involved in this case only against Wilhite. By the Wilhite proposal it was stated that the rate to be charged to the two plants would be $.35 per thousand standard cubic feet of natural gas and the estimated cost of the construction would be $750,000.

The Wilhite proposal ended with this statement: "A ruling is respectfully requested by the Commission to the effect that a certificate of convenience and necessity is not required by your Petitioners."

On April 28, 1965 this application made by Wilhite for a ruling was set for hearing on May 14, 1965, before the Public Service Commission. On May 10, 1965 Consolidated filed an application to intervene in the proceeding. Immediately thereafter Wilhite withdrew the application and on May 26, 1965, it was dismissed by the Commission without prejudice over the objections of Consolidated. Thereupon, Consolidated reopened the matter by filing a complaint on June 3, 1965, against Wilhite alleging that the proposed project was an illegal invasion of the gas market in the Clarksburg area served by Consolidated and that the operation of the same without first obtaining a certificate of public convenience and necessity would be a violation of the public utility laws of this state and that such certificate should not be issued and that Consolidated believed Wilhite intended to seek and serve other markets and to take substantial amounts of revenue from Consolidated to such extent that its other customers would be materially and adversely affected by a rise in cost and that the proposal would result in a duplication of gas utility services in the Clarksburg area. The petition of Consolidated asked for an order commanding Wilhite to cease and desist from the violation of the public utility law. This petition of Consolidated invoked the provisions of Rule 9-Interrogatories, of the Com-

mission's Rules of Practice and Procedure and submitted therewith thirty-one interrogatories which Consolidated asked that Wilhite be made to answer under oath as "necessary to and required for the prosecution of this complaint and the consideration and disposition thereof by this Commission."

Consolidated referred to itself in this petition as "Complainant" and proceeded under Rule 6 of the Commission which provides in part (b) thereof that an aggrieved party "* * * may complain to the Commission by petition substantially in the form hereinafter prescribed * * * of any thing done or omitted to be done by any public utility in violation of any of the provisions of the public service commission law of West Virginia."

Rule 9, referred to above, in the material part thereof states that "Either party may file with his complaint or answer, interrogatories in writing, to be answered under oath by the adverse party, for the discovery of facts and documents material in support of or defense against said complaint; * * * ."

The question raised by the petition or complaint of Consolidated is covered by Code 24-2-11, as amended, which provides as follows: "No public utility, person or corporation shall begin the construction of any plant, equipment, property or facility for furnishing to the public any of the services enumerated in section one, article two of this chapter, * * * unless and until it shall obtain from the public service commission a certificate of public convenience and necessity requiring such construction, * * * ". Code, 24-2-1, as amended, referred to in the above quotation is in its material parts as follows: "The jurisdiction of the commission shall extend to all public utilities in this State, and shall include any utility engaged in any of the following public services: * * * transportation af oil, gas or water by pipe line; * * * supplying water, gas or electricity, by municipalities or others; * * * and any other public service."

Code 24-1-1 defines a public utility as follows: "Except where a different meaning appears from the context, the

words 'public utility' when used in this chapter shall mean and include any person or persons, however associated, whether incorporated or not, including municipalities, engaged in any business, whether herein enumerated or not, which is, or shall hereafter be held to be, a public service."

On June 4, 1965, the Commission ordered Wilhite to satisfy the complaint or make answers thereto within the ten day period provided by Commission Rule 7 and to answer the interrogatories which had been attached to the petition or complaint of Consolidated in accordance with Rule 9. The time for answering was later extended to July 8, 1965.

On July 8, 1965, Wilhite filed its answer denying that it proposed to serve anything other than the two plants and moved to dismiss the complaint on the ground that the Public Service Commission had no jurisdiction over the matter. This same answer also refused to reply to the interrogatories after quoting Rule 6 (b) on the ground that Wilhite was not operating a *public utility* and that the Public Service Commission had not found that it had proper jurisdiction and further on the ground that the proposed sale of gas was being made pursuant to individually negotiated contracts of no concern to Consolidated.

The order of the Commission of July 21, 1965, set the matter for hearing on September 1, 1965, and on July 29, 1965, Consolidated filed a petition and motion asking that Wilhite be compelled to show cause why it was not in contempt of the Commission for the refusal to answer the interrogatories. This petition further stated that Wilhite had already begun construction of a pipeline. (At the time the evidence was later taken some testimony by Consolidated indicated that 18 miles of line was in various stages of completion and at the time the matter was finally disposed of by the Commission the pipe line was actually delivering gas to Pittsburgh Plate.)

The Commission then entered an order on August 9, 1965, requiring Wilhite to answer and file with the Commission by August 24, 1965, their answers to twenty-one interrogatories and a portion of a twenty-second one which was No.

27 in the list. Thereupon, the defendants did file the answers to the interrogatories after first making a motion to rescind the order which was denied. The matter thereupon came on for hearing before the Commission upon the interrogatories filed and upon evidence of Consolidated consisting of that of M. Kirk Hager, Executive Vice-President, Chief Operating Officer and a Director of Consolidated Gas Supply Corporation, and upon exhibits concerning which Mr. Hager testified and filed. The defendants did not present any evidence but the transcript shows that they squarely took the position that the Commission should have made its own investigation as to whether Wilhite was a public utility and should not have required Wilhite to furnish information by interrogatories. The interrogatories filed by Wilhite explained the manner in which the gas would be produced and conveyed to the industrial plants concerned and stated that the pipeline would be an 8 ⅝ inch one from the gas sources to the vicinity of Anmoore in Harrison County and from there on to the Pittsburgh Plate Glass there would be a 10 inch line (apparently from other parts of the record about 3500 feet in length). The interrogatories stated that Wilhite had entered into ten-year private contracts to supply at first a daily total of 5,000 Mcf of gas to the two plants with an additional 1000 Mcf available to Pittsburgh Plate Glass upon demand and with a reduction in minimum amount in later years. At a pressure of below 100 pounds to the square inch "up-stream" applied to the line the interrogatory stated that it would carry 4,000 to 7,000 Mcf per day. It was further stated in the interrogatory that certain agreements had been entered into with property owners along the line to give them free gas in return for rights of way.

One statement in the interrogatory which was strongly relied on in the discussion by the Commission and Consolidated to imply that it was a holding out by Wilhite to serve the public was whether there would be any excess carrying capacity of the line or any excess volume of gas. The answer to Interrogtory 29 was: "No use is proposed to be made of any excess carrying capacity of said natural gas pipe line

and facilities at the present time." The answer to Interrogatory 30 was: "No excess volume of gas is anticipated at the present time other than sufficient to meet the requirements contracted for with Pittsburgh Plate Glass Company and National Carbon Company (Union Carbon Corporation)." The answer to Interrogatory 31 was: "No excess volume of gas is anticipated at the present time." These answers relating to the possibility of enlarged services by Wilhite were referred to by the Commission in its explanation of its decision as "vague" or "feeble" answers to the direct request for information as to what Wilhite proposed to do.

The testimony of Mr. Hager relates to the nature of the Consolidated Gas Company's customers and shows that Consolidated has approximately 93,500 customers in the northern part of West Virginia and in 1964 sold 44,000,000 Mcf of gas of which slightly more than one-half or 22,889 million cubic feet of gas went to industrial consumers. In the Clarksburg and Nutter Fort area, the one affected by Wilhite operations, Consolidated had 12,700 customers of residential nature, 1200 of commercial nature and 4 major industrial customers of which the other two, besides the ones concerned, were Rolland Glass Company and Hazel-Atlas Division of Continental Can Company. To these four large industrial customers Consolidated sold in 1964, 6,010,294 Mcf producing $2,680,424.35 in revenue, of which it sold 3,576,320 Mcf of gas to Pittsburgh Plate Glass and Union Carbide at a revenue of $1,592,926.60. The residential and commercial sales in that area amount to 3,040,111 Mcf of gas producing a total revenue of $2,149,630.00. This indicates that Consolidated in 1964 thus delivered to the two industries here concerned about 40% of the total gas delivered in the Clarksburg area and collected from them approximately 33% of its total dollar volume in that area.

The testimony of Mr. Hager indicated that the total sales to Pittsburgh Plate Glass and Union Carbide were thus over 500,000 Mcf greater than the total sales to all of the commercial and residential customers in that area and that this produced an income in dollars which was three-fourths as much

as the residential and commercial customers combined. Mr. Hager testified that approximately one-half million dollars of the Consolidated investment in the Clarksburg area was directly attributable to the furnishing of gas to the two large customers Wilhite proposes to take from them.

Mr. Hager testified at some length with regard to the expansion possibility inherent in the size of the line being laid by Wilhite. He stated that according to calculation the pressure on the line could be raised to 800 pounds per square inch which would pass 55,000 Mcf per day through the line and this would be approximately three times the capacity needed to serve all of the large industrial users of gas in the Clarksburg area who were presently buying their gas from Consolidated. He further testified that this pressure could be applied because the rock pressure in the Benson field from which the line originated reached as high as 1800 pounds to the square inch.

On January 6, 1966, the Commission, after consideration of this evidence, entered the final order previously quoted directed against Wilhite-McGahee Pipe-Line, Inc., ordering it to cease and desist from the construction and operation of the pipeline in question and from furnishing gas to industrial customers in the Clarksburg area, unless and until it should have applied for and received a certificate of public convenience and necessity authorizing it to do so.

On January 17, 1966, the Pipe-Line Company filed an application for reconsideration of the final order, to which were attached affidavits of technical experts, engineering reports, and affidavits of officials of the plants served, all of which purported to show that the approximate 8-inch line was recommended to serve the purpose of the two plants and not for any other reason, and that both plants sought a dual supply of gas to avoid costly shutdowns if there was only one supply which might be interrupted, and to lessen the costs of operations in which fuel played an unduly large part, and to point out as one affidavit did that the tariff under which Consolidated served the industrial plants permitted it to shut off the plant supply, it not being what is called "firm gas."

These matters upon which reconsideration was asked were stated by the defendant Pipe-Line Company to be "after-discovered evidence." During the hearing, the defendant had stated that it wished to present no evidence. The Commission, in turning down the reconsideration, observed that there was no valid reason why this evidence could not have been presented at the hearing.

In the petition presented to this Court, Wilhite takes the position that the classification of it as a public utility and making it subject to the Commission's orders, deprives it of its property without due process of law and is against the equal protection clauses of the State and Federal Constitutions; that there was no evidence to support a finding that Wilhite had held itself out to serve the public; that the economic impact of its service furnished no grounds for the decision; that the Commission had acted arbitrarily and capriciously in refusing to reopen and reconsider the matter; that the Commission erred in requiring the defendants to answer the interrogatories under Rule 6 (b) of the Rules of Practive and Procedure of the Commission, as such Rule permits this only in complaints against public utilities, which defendants are not; and that the answering of the interrogatories eliminated the burder of proof placed on the complainant, Consolidated, by law.

The question raised by the affidavit attached to the motion to reconsider, that the gas supply of the two plants was subject to interruption, is strongly relied on by Wilhite. It was touched upon in the evidence of Consolidated during the hearing, and it appears that Hope had a tariff provision which allowed it to interrupt gas supplies to industrial consumers if there was not enough to serve other types of consumers and have anything left over, and this tariff provision was still in effect after the reorganization and change of name of the Gas Company. Mr. Hager took the position on the witness stand that this provision was nullified by the fact that the Public Service Commission regulated the industrial sales anyway. Amicus Curiae briefs were filed by both Union Carbide Corporation and Pittsburgh Plate Glass Company in support of Wilhite's position.

The only question involved in this appeal is whether or not Wilhite is a public utility. It has been the contention of Wilhite throughout this proceeding from its initial inception in the Public Service Commission that it was not a public utility and that the Public Service Commission did not have jurisdiction over the matter. The complaint was filed in the Public Service Commission by Consolidated under the provisions of Rule 6 (b) of the Rules of Practice and Procedure of the Public Service Commission which relate only to violations of the provisions of the Public Service Commission laws of West Virginia by a *public utility* and thirty-one Interrogatories were filed with Consolidated's complaint to be answered by Wilhite under the provisions of Rule 9 of the Rules of Practice and Procedure of the Public Service Commission of West Virginia. It should be noted that the procedure provided for under Rules 6 (b) and 9 of the Rules of Practice and Procedure of the Public Service Commission are applicable only where the party against whom the complaint is made is a public utility. This is the very question to be decided in this proceeding. Wilhite timely answered the complaint but refused to answer the Interrogatories on the ground that it was not a public utility. Thereafter, Consolidated asked the Public Service Commission to issus a rule to be served on the defendants requiring them to show cause why they should not be found and held to be in contempt of the Commission for the failure and refusal to answer the Interrogatories. Such procedure, if appropriate, can only be accomplished by the Commission invoking the aid of a circuit court and the contempt, if any, may be punishable by such court as contempt thereof. Code, 24-2-10. Nevertheless, in compliance with an order of the Commission ordering Wilhite to answer about twenty-two of the Interrogatories said order was compiled with and upon the information contained in the answers to these Interrogatories, coupled with the testimony of M. Kirk Hager, Executive Vice-President of Consolidated, which was based mainly on the information contained in the Interrogatories and questions supplied by the members of the Commission which had no factual foundation, Wilhite was found to be a public utility. No evidence was offered by Wilhite at the

hearing. It would appear from the statement of the Public Service Commission filed in this Court under the provisions of Code 24-5-1 wherein an attempt was made to explain why the Commission required Wilhite to answer the Interrogatories over its objection on the ground that it was not a public utility and that the Public Service Commission did not have jurisdiction to require the answers of such Interrogatories requested by the complainant, Consolidated, that it decided that Wilhite was a public utility before any investigation or hearing was ever held by virtue of the following statement in connection therewith: "The answer to this, of course, is that the Commission held the defendants to be a public utility." That the Commission had authority to investigate the status of Wilhite or any other person, firm or corporation, as to whether or not it was a public utility can not be questioned because such power is given to it under the Public Service Commission Law, Code, 24-2-2, as amended, and by Rule 6 (c) of the Rules of Practice and Procedure of the Public Service Commission which also authorizes such investigation and which it had authority under the law to promulgate. Code, 24-2-11, as amended. By the procedure followed in this case it clearly appears that the burden of proof has been shifted to Wilhite to establish that a need for a certificate of public convenience and necessity does not exist in this case. Wilhite was not an applicant for obtaining a certificate of public convenience and necessity and the burden of proof rests on an applicant to establish this matter. Code, 24-2-11, as amended.

The Public Service Commission has no jurisdiction and no power or authority except as conferred on it by statute, and its power is confined to the regulation of public utilities. *Eureka Pipe Line Co.* v. *Public Service Commission,* 148 W. Va. 674, 137 S. E. 2d 200; *City of Bluefield* v. *Public Service Commission,* 94 W. Va. 334, 118 S. E. 542. A Public Service Commission has no inherent power or authority but may, of course, have necessary implications from the statute. 73 C.J.S., Public Utilities, §38; *Eureka Pipe Line, Co.* v. *Public Service Commission,* *supra.* The test as to whether or not a person, firm or corporation is a public

utility is that there must be a dedication or a holding out either express or implied that such person, firm or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part thereof as distinguished from the serving of only particular individuals. 73 C.J.S., Public Utilities, §2; *Preston County Light and Power Co.* v. *Renick,* 145 W. Va. 115, 113 S. E. 2d 378. There is no evidence in the case at bar that Wilhite ever held itself out to serve the public with gas supplies. The evidence clearly shows that it intends to serve, and is serving, only two customers at the present time and these customers are being served under contracts therewith. The contracts provide that it will furnish gas to the Union Carbide Company and the Pittsburgh Plate Glass Company for $.35 Mcf and that it will obtain such gas from its own wells or purchase said gas from suppliers for a price of $.25 Mcf. These contracts are firm contracts to furnish such supply of gas. On the other hand, the gas supplied by Consolidated to these two industrial concerns is supplied for a price of $.44 Mcf and can be interrupted if the service to commercial and residential customers warrants it. In other words, Consolidated, a public utility, is not committed to provide a firm supply of gas to these industrial concerns. The evidence shows that Wilhite does not furnish all of the gas used by Union Carbide and Pittsburgh Plate Glass and that Consolidated still supplies some gas to these industrial concerns. The gas supplied by Wilhite to the two industrial concerns is an additional supply to fill all of their needs in order that these industrial concerns can run at full capacity at all times. Although a dedication to public service or a holding out to supply the public may be implied, it will not be presumed from the fact that the product or service is a product or service usually supplied by a utility. Such dedication or holding out is never presumed without evidence of unequivocal intention. *Allen* v. *R.R. Comm. of the State of California,* 175 P. 466, 179 Cal. 68, 8 A.L.R. 249.

Great stress is placed by the Commission on the answers by Wilhite to Interrogatories 30 and 31, wherein Wilhite stated that no excess volume of gas was anticipated at the present time other than that sufficient to meet the require-

ments of the contracts with Union Carbide and Pittsburgh Plate Glass Company and that no excess volume of gas was anticipated at the present time to furnish any persons, firms or corporations at any place upon any terms or conditions. The Commission stated in its final order that these answers "seem rather feeble". The fact remains that at the present time Wilhite furnishes a supply of gas under contract only to the Pittsburgh Plate Glass Company and Union Carbide and has no excess volume at the present time and none is anticipated. The excess volume was inserted into this case at the hearing when one of the commissioners gratuitously asked what the supply would be under an 800 pound pressure and the witness, a vice president of Consolidated, replied 55,000 Mcf. There was no evidence that any such pressure would be used in supplying gas through Wilhite's pipeline. The only evidence with regard to the supply of gas by Wilhite was that it would be supplied at a pressure of below 100 pounds to the square inch "up-stream" and would carry 4,000 to 7,000 Mcf per day. The Commission found, from these statement that no excess volume of gas was anticipated at the present time other than to meet the requirements under the contracts with the two companies concerned, that this implied a holding out to serve the public and therefore constituted Wilhite a public utility. This finding is not supported by such evidence and the law applicable thereto. *Llano, Inc.* v. *Southern Union Gas Company*, 399 P. 2d 646. The *Llano* case is quite similar to the one at bar. Llano entered into an agreement to buy gas from one concern and sell it to an industrial concern. It then built a 28-mile pipeline to transport the gas from the place of purchase to the place of delivery. A utility then filed a complaint, as was done in the case presented here, against Llano claiming that such service resulted in a loss to it of one-half million dollars a year. The Public Service Commission of New Mexico held that Llano was a public utility, but such holding was reversed by the courts on the ground that there was no evidence of Llano's holding itself out to serve the public and that it was not a public utility at that time although the court said that it expressed no opinion as to what might be Llano's status if and when it

commenced to serve additional users with additional gas. The court also found that the supply of gas was not enough to fulfill its commitment and no other gas was available. The Public Service Commission of this State attempts to distinguish this case on that ground. This would appear to be immaterial, because an additional supply of gas could be later obtained. The real meat of the matter is whether it would be used for purposes other than supplying gas in accordance with the provisions of the contracts made with the industrial concerns. The mere fact that a product which is usually dispensed by or sold by a utility to the public is being furnished does not make every person, firm, or corporation selling such product a public utility. If such product is sold under private contract and the seller does not hold himself out to sell such product to the public or render some service to the public he is not a public utility. *Allen* v. *R.R. Comm. of the State of California, supra.*

The mere transportation of its own natural gas by a company does not make it a public utility and the private sale to furnish "firm" gas does not make it a public utility. *Richfield Oil Corp.* v. *Public Utilities Commission of the State of California,* 354 P. 2d 4.

The cases dealing with the matter involved in the case at bar in some instances are rather confusing and appear to be in conflict. The case of *Mississippi River Fuel Corp.* v. *Illinois Commerce Com'n.,* 1 Ill. 2d 509, 116 N. E. 2d 395, held that a company which bought gas in Texas and Louisiana and shipped it to Illinois where it was sold to a public utility but retained the right to sell to industrial customers directly was not a public utility that could be regulated by the state. However, the decision in this case appears to be in conflict with the so-called Panhandle Eastern Pipe Line cases. In the *Panhandle Eastern Pipe Line Co.* v. *Public Service Commission of Indiana et al.,* 332 U. S. 507, 68 S. Ct. 190, 92 L. Ed. 128, which was an appeal from the Supreme Court of Indiana, the United States Supreme Court held that the Panhandle Eastern Pipe Line Company which was already an interstate utility could be regulated as a utility by the Public Service Commission of Indiana

where it sold gas acquired in another state directly to a few Indiana industries. The case of *Panhandle Eastern Pipe Line* v. *Michigan Public Service Commission*, 341 U. S. 329, 95 L.Ed. 993, held that the same company which was a public interstate pipeline utility could not serve directly large industrial concerns in Michigan without obtaining a certificate of convenience and necessity before competing with local gas distribution public utilities.

It is the contention of Consolidated that Wilhite has invaded its territory and taken some of its largest customers resulting in financial loss to it and as a result thereof the rates to its other customers will have to be increased and therefore the furnishing of gas by Wilhite to the two industrial concerns affects the public interest and Wilhite should be regulated by the Public Service Commission.

Although Wilhite's furnishing of gas to these two industrial concerns does result in a considerable monetary decrease to Consolidated in the Clarksburg area it should be pointed out that this monetary decrease is comparatively small when it is cosidered with the entire business of Consolidated in West Virginia wherein it furnishes 44 billion cubic feet of gas to 93,500 customers. The amount of business done is not the test for finding a company to be a public utility in this state. Such company, in order to be a public utility, must be dedicated to the public service and hold itself out to supply the public. 73 C.J.S., Public Utilities, §2; *Preston County Power and Light Company* v. *Renick, supra; Llano, Inc.* v. *Southern Union Gas Company, supra.* The granting of a certificate of convenience and necessity to a public utility does not grant a monopoly in the sale of a product or services by such public utility. Such public utility is protected against unauthorized encroachment by other public utilities but is not protected from competition by individuals or corporations acting in their private capacity. It should be noted that the Public Service Commission has been given power and authority by the legislature to regulate both public carriers for transportation and contract carriers for transportation. Code, 24A-3-1, as amended. No such legislative authority is given to

the Public Service Commission to regulate transportation of oil and gas products by a non-public utility.

However, it is immaterial what a person, firm or corporation is called or how and in what manner service to the public is furnished, whether it is by special contract or otherwise, if such person, firm or corporation *dedicates* himself or itself to public service and holds himself or itself out to serve the public with a product such as gas, oil, electricity or water. They, by such actions, constitute themselves a public utility. In determining whether or not a company is a public utility the law looks at what is being done, not what it is asserted that it is doing. *Wingrove* v. *Public Service Commission,* 74 W. Va. 190, 81 S. E. 734.

It would appear that if Wilhite is held to be a public utility by the Public Service Commission and prohibited from furnishing gas to the two industrial concerns involved herein this would constitute Consolidated as a monopoly in the furnishing of such gas because Pittsburgh Plate Glass Company and Union Carbide could not obtain gas from anyone other than Consolidated. If this is the case it would discourage and prohibit private enterprise, and such monopoly could only be granted by the legislature.

It was held in the leading case of *Clarksburg Light & Heat Company* v. *Public Service Commission of West Virginia,* 84 W. Va. 638, 100 S. E. 551, which was a rate case, that the Clarksburg Light & Heat Company was a public utility in the furnishing of services to industrial consumers and for the rates charged therefor. This was done notwithstanding the tariff provisions saying that such industrial consumers would not be a public service. However, the decision in this case did not involve the part of the tariff which provides that such public utility did not have to furnish a firm supply of gas to industrial consumers.

From the facts and circumstances contained in and surrounding the case at bar we are of the opinion that there is no evidence to warrant a finding that Wilhite has dedicated itself to public service or held itself out to serve the public and in fact there is no evidence that it has in any

way served the public. The evidence is to the effect that it has contracts to serve two industrial concerns and that is all it intends to serve at the present time and that it has no intention for the use of any excess volume of gas to be used in its pipeline. However, if Wilhite attempts to serve the public in the future or increases its supply of gas for such purpose and uses it for such purpose it may properly be held by the Public Service Commission to be a public utility.

It was held in the third point of the syllabus in the case of *Atlantic Greyhound Corp.* v. *Public Service Commission et al.,* 132 W. Va. 650, 54 S. E. 2d 169, that: "A final order of the Public Service Commission, based upon findings not supported by evidence, or based upon a mistake of law, will be reversed and set aside by this Court upon review."

For the reasons stated herein, the order of the Public Service Commission dated January 26, 1966, refusing to reconsider or grant a rehearing to Wilhite and to vacate its final order of January 6, 1966 was erroneous, and the final order of the Commission of January 6, 1966, was not supported by the evidence or was based upon a mistake of law and it is therefore reversed and set aside and remanded to the Commission with directions to dispose of the case in the manner prescribed by law and in conformity with the principles stated in this opinion.

*Reversed and remanded with directions.*