IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

**FILED**
**May 23, 2025**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 24-637

HUNTINGTON SANITARY BOARD,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and HUBBARD HEIGHTS
SUBDIVISION ASSOCIATION, et al.,
Respondents.

Appeal from the Public Service Commission of West Virginia
Case No. 23-0010-S-DU

AFFIRMED

Submitted:  March 18, 2025
Filed: May 23, 2025

Ancil Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
Todd M. Swanson, Esq.
Steptoe & Johnson PLLC
Charleston, West Virginia
Counsel for Petitioner

Robert R. Rodecker, Esq.
John R. McGhee, Jr., Esq.
Cynthia L. Wilson, Esq.
Kay Casto & Chaney PLLC

Jessica M. Lane, Esq.
Susan M. Stewart, Esq.
Public Service Commission of West
Virginia
Charleston, West Virginia
Counsel for Respondent Public Service
Commission

Charleston, West Virginia
Counsel for Amicus Curiae
City of Elkins and Town of Harman

F. Paul Calamita, Esq.
AQUALAW PLC
Richmond, Virginia
Counsel for Amicus Curiae
West Virginia Municipal Water Quality
Association

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE TRUMP deeming himself disqualified did not participate in the decision.

JUDGE DYER sitting by temporary assignment.

1. "'The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W. Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.' Syl. Pt. 1, *Cent. W. Va. Refuse, Inc. v. Pub. Serv. Comm'n of W. Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993)." Syllabus Point 2, *Sierra Club v. Pub. Serv. Comm'n of West Virginia*, 241 W. Va. 600, 827 S.E.2d 224 (2019).

2. "The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority." Syllabus Point 2, *Wilhite v. Pub. Serv. Comm'n,* 150 W. Va. 747, 149 S.E.2d 273 (1966).

3. "Where the transmission line of a public utility has been used directly to serve retail rural consumers over a long period of time, such use constitutes a dedication of that line to the public service and such facility will continue to be so dedicated and the owner thereof will continue to operate as a public utility unless and until permission is

obtained from the Public Service Commission to terminate such status." Syllabus Point 3, *Boggs v. Pub. Serv. Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970).

4.      "Jurisdiction of the Public Service Commission over a public utility will not be considered to be terminated unless the action of the Commission and the circumstances surrounding the case demonstrate clearly and unequivocally its intent to relinquish such jurisdiction." Syllabus Point 1, *Boggs v. Pub. Serv. Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970).

5.      "The mere failure of a public utility to invoke the jurisdiction or the regulatory power of the Public Service Commission for a long period of time, or the mere failure of the Commission affirmatively to assert in any manner its jurisdiction with respect to the public service rendered does not divest the utility of its original status as a public utility." Syllabus Point 4, *Boggs v. Pub. Serv. Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970).

6.      "'The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33 [99 S.E.2d 1 (1957)]." Syllabus Point 5, *Boggs v. Pub. Serv. Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970).

WALKER, Justice:

The Distressed and Failing Utilities Act[1] directs the Public Service Commission of West Virginia (PSC) to remediate struggling utilities such as sewer districts. The sewer system of Hubbard Heights subdivision in Wayne County is one such failing utility, and Petitioner Huntington Sanitary Board (HSB) was designated by the PSC as the most suitable capable proximate utility (CPU) to acquire and resume its operations under West Virginia Code § 24-2H-7(a) (2020). On appeal of the PSC's order to that effect, HSB argues that the PSC lacks jurisdiction over this small failing utility because its customer base fell below twenty-five, the threshold for PSC jurisdiction under West Virginia Code § 24-2-1(a)(8) (2023). HSB also challenges its designation as the most suitable CPU, citing logistical and financial concerns. Because we find that the PSC appropriately exercised continuing jurisdiction over Hubbard Heights and that it gave reasoned consideration to all statutory requirements before ordering HSB to acquire this failing utility, we affirm.[2]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Hubbard Heights is a subdivision located in Wayne County. Its sewer system consists of septic tanks at each residence that feed into the main sewer, eventually feeding

---

[1] W. Va. Code §§ 24-2H-1 to -9.

[2] The Court would like to acknowledge the participation in this case of the City of Elkins, Town of Harman, and Municipal Water Quality Association, who filed briefs in support of Petitioner. The Court has considered the arguments presented in conjunction with the parties' arguments.

1

into three treatment lagoons. In 2001, the Hubbard Heights Homeowners Association (HOA) applied to become a sewer utility regulated by the PSC, which certificate of convenience and necessity was granted in 2002. At the time of application, the Hubbard Heights sewer utility was servicing twenty-seven customers. But by 2011, the HOA stopped filing its annual reports with the PSC and the PSC initiated several proceedings against it for failure to file its annual reports and assessed fees that were never paid. The HOA filed a joint petition with West Virginia American Water Company for approval to terminate water services for non-payment of sewer bills in 2013, but never filed a request for dissolution with the PSC. The HOA was administratively dissolved as an entity by the West Virginia Secretary of State in 2014.

In response to growing concerns with West Virginia's water and wastewater utilities, the West Virginia Legislature passed the Distressed and Failing Utilities Act in 2020, aimed at permitting advanced corrective measures for those utilities unable to "adequately serve customers and maintain regulatory compliance."[3] In 2023, former HOA president Tim Dillon filed a petition[4] with the PSC under West Virginia Code § 24-2H-6 to have the Hubbard Heights sewer system declared a failing or distressed utility for purposes of invoking the remedies available under the Act to correct the conditions of the utility.

_____

[3] W. Va. Code § 24-2H-2(f).

[4] Evidence was adduced below that a manager with the PSC contacted Mr. Dillon to inform him of the new enactment and directing him to file the petition. While helpful for context, it has no bearing on this Court's analysis of the relevant statutes.

PSC staff investigated the sewer system and served discovery on Mr. Dillon, who had little information regarding the utility's operations, or, rather, lack thereof. The Town of Ceredo, the North Wayne Public Service District, Kenova Municipal Sewer, Spring Valley Public Service District, West Virginia American Water Company, and HSB were added as respondent utilities consistent with West Virginia Code § 24-2H-6(a).[5] A public hearing was held on July 25, 2023, and a supplemental evidentiary hearing followed in February 2024. No party contested that the Hubbard Heights sewer system met the statutory definition of a failing utility[6] for purposes of reaching the Act's corrective measures, but

---

[5] In relation to the public hearing procedure upon the filing of a petition, the statute requires, in relevant part, that the PSC "include, as additional parties, any capable proximate public and private utilities that may be able to acquire the utility."

[6] Under West Virginia Code § 24-2H-5(a), the PSC determines whether a utility meets the definition of a "distressed" or "failing" utility as defined in West Virginia Code § 24-2H-3 and accounts for the following considerations before remedies attendant to that classification are warranted:

> (a) In determining whether a utility is distressed or failing, the commission shall consider the following factors:
>
> (1) The financial, managerial, and technical ability of the utility;
>
> (2) The level of expenditures necessary to make improvements to the water or wastewater utility to assure compliance with applicable statutory and regulatory standards concerning the adequacy, efficiency, safety, or reasonableness of utility service and the impact of those expenditures on customer rates;
>
> (3) The opinion and advice, if any, of the Department of Environmental Protection and the Bureau for Public Health as to steps that may be necessary to assure compliance with applicable statutory or regulatory standards concerning the adequacy, efficiency, safety, or reasonableness of utility service;

3

the Administrative Law Judge's recommended decision and the PSC's order adopting that recommendation contain extensive findings that the collection and treatment infrastructure of Hubbard Heights is "completely dilapidated," has no operations or staff maintaining the utility, is in danger of collapse, and poses a threat of sewage leaking into water wells, presenting a risk to community health.

The chief concern of the PSC in conducting the evidentiary hearings was to ascertain the extent of the problem as far as it impacted potential solutions. Once it concluded that acquisition was the most appropriate solution given the total absence of HOA operations and management, the PSC next determined which respondent utility was the most suitable CPU to acquire the Hubbard Heights sewer system and bring it into compliance. In short, no respondent utilities were willing to do so in light of the financial and logistical behemoth posed by the project and the potential for inherited liability. Finding that HSB is the largest sewer utility in West Virginia, is located in close proximity to Hubbard Heights (albeit not within Huntington city limits), and is the most financially and operationally capable of absorbing the impact of the project, the ALJ designated it as

---

(4) The status of the utility's bond payments and other financial obligations;

(5) The status and result of any corrective measures previously put into place under § 24-2H-7 of this code; and

(6) Any other relevant matter.

the most suitable CPU to address Hubbard Heights's sewer deficiencies.

HSB filed exceptions with the PSC arguing that the PSC lacked jurisdiction over the Hubbard Heights sewer system and that the ALJ did not consider proximity, financial impact, lack of available funding, and the existence of acceptable alternatives to acquisition. The PSC rejected those exceptions and adopted the ALJ's recommendation designating HSB as the appropriate CPU. HSB appeals from that order, reasserting that the PSC lacked jurisdiction over Hubbard Heights and did not comply with the Act when ordering it to acquire the Hubbard Heights sewer system and resume its operations.

## II.    STANDARD OF REVIEW

Appeals from orders of the Public Service Commission are reviewed under the following deferential standard:

> "The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W. Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper." Syl. Pt. 1, *Cent. W. Va. Refuse, Inc. v. Pub. Serv. Comm'n of W. Va.*, 190 W.Va. 416, 438 S.E.2d 596 (1993).[7]

---

[7] Syl. Pt. 2, *Sierra Club v. Pub. Serv. Comm'n of W. Va.*, 241 W. Va. 600, 827 S.E.2d 224 (2019).

5

With that standard in mind, we turn to the parties' arguments.

## III.    ANALYSIS

HSB argues on appeal that, because the Hubbard Heights's sewer system's customer count currently is below the twenty-five customers required to come within the PSC's jurisdiction, the PSC had no authority to order its acquisition under the Act. Alternatively, HSB argues that the PSC's order fails to consider various aspects required by West Virginia Code § 24-2H-5(b) in designating it as the most suitable CPU and should be reversed and remanded for compliance with the statute. We address the threshold issue of jurisdiction before turning to the PSC's statutory analysis.

### A.    *Jurisdiction under West Virginia Code § 24-2-1(a)(8)*

Regarding jurisdiction of the PSC, we have recognized that "[t]he Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority."[8]  In 2002, the Hubbard Heights sewer system had twenty-seven customers, and the PSC granted the HOA's application and exercised jurisdiction over the utility pursuant to West Virginia Code § 24-2-1(a)(8), which provides that "the jurisdiction of the commission extends to all public utilities in this state and includes any utility engaged in any of the following public

---

[8] Syl. Pt. 2, *Wilhite v. Pub. Serv. Comm'n,* 150 W. Va. 747, 149 S.E.2d 273 (1966).

6

services: . . . sewer systems servicing 25 or more persons or firms other than the owner of the sewer systems."

HSB does not contest the original exercise of jurisdiction, but disputes that the PSC may continue to assert jurisdiction on the basis of a 2002 assessment of customers when the evidence in the underlying proceeding is that, of the 27 customers assessed in 2002, at least five Hubbard Heights residents have installed home aeration units, others are no longer connected to the sewer system at all, and the utility does not charge any fees. HSB further asserts that the PSC had an obligation to reassess the basis of its jurisdiction because the Act was not effective until 2020 and involves an adjudicatory function that this Court has specified as serving a different purpose than the general, regulatory functions of the PSC. The PSC responds that its jurisdiction, once established, is not intermittent and cannot be constantly reassessed based on fluctuating numbers of customers. Upon review of this Court's jurisprudence on the continuing nature of PSC jurisdiction, we agree that the PSC has jurisdiction over the Hubbard Heights sewer system.

To stage the jurisdictional analysis, we first establish that this is a matter of *continuing* jurisdiction and readily distinguish the cases relied on by HSB to demonstrate that Hubbard Heights's customer count alone is dipositive. Those cases, *Broadmoor/Timberline Apartments v. Public Service Commission*[9] and *Schoolcraft v.*

---

[9] 180 W. Va. 387, 376 S.E.2d 593 (1988).

*Tuel*,[10] were decided in the context of an *initial* exercise of jurisdiction to bring the utility within the gambit of the PSC's regulatory authority. They have no bearing on the analysis here where it is undisputed that the Hubbard Heights sewer system, in the past, has been appropriately regulated by the PSC as a public utility.

Our analysis of the PSC's continuing jurisdiction over a public utility is guided by the syllabus of *Boggs v. Public Service Commission*.[11] In *Boggs*, this Court was asked to examine the continuing jurisdiction of the PSC in the context of a natural gas transmission line that was initially owned by a public utility but was later transferred to a private owner.[12] There, this Court found that because the line had been dedicated to the public service, it continued to be regulated by the PSC because the operator had not obtained permission to divest itself of "public utility" status:

> Where the transmission line of a public utility has been used directly to serve retail rural consumers over a long period of time, such use constitutes a dedication of that line to the public service and such facility will continue to be so dedicated and the owner thereof will continue to operate as a public utility unless and until permission is obtained from the Public Service Commission to terminate such status.[13]

More broadly, *Boggs* held that "[j]urisdiction of the Public Service Commission over a

---

[10] Case No. 13-0140-S-C (Comm'n Order, March 19, 2013).

[11] 154 W. Va. 146, 174 S.E.2d 331 (1970).

[12] *Id.* at 147-48, 174 S.E.2d at 333.

[13] *Id.* at Syl. Pt. 3.

8

public utility will not be considered to be terminated unless the action of the Commission and the circumstances surrounding the case demonstrate clearly and unequivocally its intent to relinquish such jurisdiction."[14]

From our review of the record, we observe that Hubbard Heights never sought to be divested of its status as a public utility. Similarly, we see no clear and unequivocal intent on behalf of the PSC to relinquish jurisdiction over Hubbard Heights. While HSB argues that the 2002 customer count is stale and that the PSC has neglected active regulation of Hubbard Heights since the limited interaction of granting the certificate of convenience and necessity, Syllabus Point 4 of *Boggs* instructs that

> [t]he mere failure of a public utility to invoke the jurisdiction or the regulatory power of the Public Service Commission for a long period of time, or the mere failure of the Commission affirmatively to assert in any manner its jurisdiction with respect to the public service rendered does not divest the utility of its original status as a public utility.[15]

Rather than squarely address the syllabus points in *Boggs* that were recently applied by this Court in *Equitrans, L.P. v. Public Service Commission of West Virginia*,[16] HSB relies on a presumptive requirement that the PSC reexamine the basis of its jurisdiction upon undertaking any adjudicatory function. And, more particularly, HSB

---

[14] *Id.* at Syl. Pt. 1.

[15] *Id.* at Syl. Pt. 4.

[16] 247 W. Va. 646, 885 S.E.2d 584 (2022).

9

argues that the PSC had an obligation to reassess Hubbard Height's 2002 customer count before acting upon authority the Legislature did not vest it with until passage of the Act in 2020.

HSB contends that our decision in *Broadmoor* stands for the proposition that "[the PSC's jurisdiction] must exist when the PSC exercises jurisdiction to satisfy that jurisdictional prerequisite."[17] While perhaps true *outside* of the regulatory context, we find no such support in that case to demand a customer recount for purposes of the PSC's jurisdiction here. There, the PSC had previously determined that it had no jurisdiction over Broadmoor based on a customer count of less than twenty-five and the PSC maintained that finding in a subsequent complaint.[18] Having no initial regulatory jurisdiction over Broadmoor, the issue on appeal was the PSC's subsequent exercise of jurisdiction where Broadmoor's sewer lines were potentially affected.[19] But the PSC's exercise of jurisdiction, which this Court affirmed, was *over the City of Morgantown* (a public utility).[20] The order was not directed at Broadmoor—over which it had no jurisdiction— but rather required the City to acquire Broadmoor's sewer lines consistent with the ALJ finding that Broadmoor "unlawfully interposed itself between the city and its sewer

---

[17] *Supra* n.9.

[18] *Broadmoor*, 180 W. Va. at 389-90, 376 S.E.2d at 595-96.

[19] *Id.*

[20] *Id.* at 391, 376 S.E.2d at 597.

10

customers."[21]   So, as discussed above, *Broadmoor*'s relevance is limited to the acknowledgement that the PSC has no *initial* jurisdiction over sewer utilities with fewer than twenty-five customers, a fact no one disputes.  We disagree that it requires that the PSC revisit its initial jurisdiction inquiry under West Virginia Code § 24-2-1 to reevaluate Hubbard Heights's customer count upon each exercise of regulatory authority.

In rejecting the assertion that the PSC's jurisdiction is intermittent and its continuing authority dependent on customer counts, we acknowledge that this Court distinguished regulatory and adjudicatory functions in *State ex rel. Public Service Commission v. Fayetteville*,[22] and that we reexamined a public utility's customer count in analyzing jurisdiction for rate making regulation in *Pool v. Greater Harrison County Public Service District*.[23]  But neither *Fayetteville* nor *Pool* is applicable in determining the PSC's jurisdiction over Hubbard Heights.[24]

In *Fayetteville*, the Court analyzed an exemption for municipalities from PSC regulation in the context of rate approval that the municipality argued exempted it from all

---

[21] *Id.* at 390, 376 S.E.2d at 596.

[22] 212 W. Va. 427, 573 S.E.2d 338 (2002).

[23] 241 W. Va. 233, 241 S.E.2d 14 (2018).

[24] At oral argument, HSB conceded that the PSC's jurisdiction over it was not in dispute, and neither the briefing nor the record is sufficiently developed for this Court to conduct a sua sponte analysis of the PSC's jurisdiction over HSB in this context.  *See infra* n.33.

11

attendant rate and charge disputes within the broader statutory scheme.[25]  Stressing that

"[t]he PSC's authority over rates and charges of municipalities . . . is expressly limited by

the statutory scheme[,]"[26] and drawing a distinction between rate making functions and

adjudicatory functions, we concluded that the PSC maintained authority and jurisdiction

over the municipality in the exercise of its general powers:

> The statute merely exempts municipalities from the rate approval sections of 24-2-4 and 24-2-4a; it does not deprive the PSC of jurisdiction over the municipality or eliminate the PSC's authority to otherwise address issues of the municipally operated public utilities.  The rate making functions, statutorily limited with regard to municipalities, are not identical to the adjudicatory functions.[27]

HSB posits that *Fayetteville* indicates that this Court views jurisdiction of the

PSC as dependent on the function it is performing, and that the PSC may have jurisdiction

in some respects (the authority to grant a certificate of convenience and necessity), but not

in others (imposing the drastic remedies under the Act).  But HSB's argument fails to

appreciate that those distinctions in function are relevant to jurisdiction only so far as the

Legislature has *made* them so by statute, which is not the case with the Act.

Likewise, in *Pool*, a customer's complaint relating to rate hikes was

---

[25] *Fayetteville*, 212 W. Va. at 433, 574 S.E.2d at 343.

[26] *Id.*

[27] *Id.* at 432-33, 573 S.E.2d at 343-44 (footnote omitted).

dismissed by the PSC upon a finding that it lacked jurisdiction over ratemaking for public service districts with more than 4,500 customers, and she appealed that finding.[28]  This Court was asked to "examine the PSC's statutory jurisdiction over ratemaking by a public service district, jurisdiction that hinges on the number of 'customers' served by the district."[29]  After concluding that the PSC's method of counting sewer and water customers was consistent with the relevant statutes, we affirmed the PSC's determination that it did not have jurisdiction over the public service district because the customer count exceeded the statutory maximum of 4,500 customers.[30]  HSB argues that *Pool* demonstrates not only the ability of the PSC to regularly evaluate customer counts before exercising jurisdiction, but the requirement that it do so.  We disagree.

Again, the circumstances of *Pool* extract it from the near presumption of continuing jurisdiction in *Boggs* because it involves legislative action to specifically deprive the PSC of jurisdiction it was otherwise previously exercising and would have *continued* exercising but for that legislative action.  As we explained in *Pool*, West Virginia Code § 24-1-1(j) articulated a legislative finding that "larger public service districts are 'most fairly and effectively regulated by the local governing body with respect to rates,

---

[28] *Pool*, 241 W. Va. at 235, 821 S.E.2d at 16.

[29] *Id.*

[30] *Id.*

13

borrowing and capital projects[,]'"[31] that prompted the Legislature to "adopt[] deregulation measures to limit the PSC's jurisdiction and to exempt large public service districts from [PSC ratemaking approval]."[32]  Contrary to the scheme of deregulation and new statutory limitations on jurisdiction that demanded this Court conduct a customer count to reevaluate the PSC's jurisdiction in *Pool*, the enactment at issue here *expands* the scope of the PSC's authority.

Both *Fayetteville* and *Pool* were decided in the context of the Legislature's explicit statutory limitations on the PSC's jurisdiction, not under the continuing jurisdiction analysis espoused in *Boggs*, and no such statutory limitations on jurisdiction exist within the Act.  So, even though the PSC's authority under the Act did not exist until 2020, some eighteen years after the PSC's initial exercise of jurisdiction over Hubbard Heights, we decline to abandon *Boggs* in favor of an overbroad and unfounded requirement that the PSC reassess its initial jurisdiction over a public utility with every subsequent action of the Legislature absent its direction to do so.

We understand that the PSC's authority under the Act would be unfairly categorized as simply regulatory and is immense, indeed.  But we see nothing in that enactment that requires the PSC to reevaluate the customer count underlying the basis of

---

[31] *Id.* at 236, 821 S.E.2d at 17 (quoting W. Va. Code § 24-1-1(j)).

[32] *Id.*

14

its initial jurisdiction over Hubbard Heights[33] before it may exercise that immense power. Moreover, where the basis of this enactment is to aid and address utilities that are failing for, among other things, dropping customer counts,[34] it would be contrary to its purpose to require a reexamination of jurisdiction on the ground that the customer count had fallen so as to deprive the public utility of the PSC's assistance. In the absence of legislative direction limiting the PSC's continuing jurisdiction as far as the Act is concerned, we find *Boggs* to be dispositive of the jurisdictional issue before us and affirm the PSC's order in that respect.

## B.     *Compliance with the Act and Application of West Virginia Code § 24-2H-5(b)*

HSB's second assigned error is that the PSC erred as a matter of law in compelling it to acquire the assets and resume operations of Hubbard Heights because its order failed to comply with the Act. In an analysis of the PSC's findings and compliance with statutory enactments, we are mindful of our deferential vista in these matters:

> "The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of

---

[33] In reaching this conclusion, we note that Hubbard Heights does not meet the organizational or other criteria of those utilities over which the PSC exercises more limited jurisdiction outlined in West Virginia Code § 24-2-1(b) and that the limitations of the PSC's jurisdiction with regard to those entities are not at issue in this case.

[34] *See* W. Va. Code § 24-2H-2, containing the legislative findings prompting adoption of the Act, lists at subsection (e) that "[m]any water and wastewater utilities have experienced a loss of customers resulting from decline in populations served which has created an additional rate burden on the remaining population."

15

legal principles." *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33 [99 S.E.2d 1 (1957)].[35]

In arguing that the PSC failed to comply with the Act's requirements, HSB contests its selection as the *most suitable* CPU for acquisition of Hubbard Heights under West Virginia Code § 24-2H-7(a): "If the commission determines that the utility is a failing utility, then the commission may order the acquisition of the failing utility by the most suitable capable proximate water or wastewater utility, if there is more than one." But its argument is couched in terms of available alternatives to acquisition under West Virginia Code § 24-2H-7(b) and its designation as a CPU, generally, under West Virginia Code § 24-2H-4(b).

### 1. *Alternatives to Acquisition under West Virginia Code § 24-2H-7(b)*

The Act requires the PSC to consider feasible alternatives prior to ordering the acquisition of a failing utility, detailed in West Virginia Code § 24-2H-7(b), which provides

> Before the commission may designate a water or wastewater utility as failing and order acquisition by a capable proximate utility it shall determine whether there are any alternatives to an ordered acquisition. If the commission determines that an alternative to designating a utility as failing and ordering an acquisition is reasonable and cost effective, it may order the distressed utility and, if applicable to the alternative a capable proximate utility, to implement the alternative. Commission

---

[35] Syl. Pt. 5, *Boggs*, 154 W. Va. 146, 174 S.E.2d 331

16

staff shall work with the utility to implement the alternative, as necessary. Alternatives that the commission may consider include, but are not limited to, the following:

(1) Reorganization of the utility under new management or a new board, subject to the approval of the applicable county commission(s) or municipal government;

(2) Operation of the distressed utility by another public utility or management or service company under a mutually agreed arms-length contract;

(3) Appointment of a receiver to assure the provision of adequate, efficient, safe and reasonable service and facilities to the public pursuant to § 24-2-7(b) of this code;

(4) Merger of the water or wastewater utility with one or more other public utilities, subject to the approval of the applicable county commission(s) or municipal government;

(5) The acquisition of the distressed utility through a mutual agreement made at arms-length; and

(6) Any viable alternative other than an ordered acquisition by a capable proximate utility.

With respect to available alternatives to acquisition, HSB argues that the PSC failed to consider the following alternatives: (1) a decentralized or packaged plant constructed or operated by HSB or one of the other CPUs; (2) a new collection system operated by North Wayne or Ceredo; and (3) installation of private aeration units on each parcel. Importantly, the statute does not require that the PSC *adopt* an alternative merely because it exists. The statute requires the PSC to *consider* whether there might be alternatives to acquisition and provides that it *may* order some less drastic measure if it finds an alternative both reasonable and cost effective.

17

So, the question before us in our deferential review is whether the PSC considered the availability of alternatives to acquisition; the record reflects that it did, and still found that acquisition was the most appropriate measure given the circumstances. Specifically, the ALJ order adopted by the PSC analyzes each of the statutory alternatives to acquisition, finding that Hubbard Heights's status as a totally nonoperational entity with little to no member involvement precluded those alternatives for lack of external resources and personnel to correct the conditions of the existing Hubbard Heights sewer system infrastructure and combat the health and environmental risks it poses.

The first two "alternatives" HSB argues should have been considered under West Virginia Code § 24-2H-7(b) were proposed by PSC engineering staff as operational alternatives to reviving the existing collection and treatment system, not alternatives to *acquisition*. The PSC staff report containing those recommendations would have still required that the selected CPU "own[], operate[], and maintain" the new collection system or decentralized sewer treatment system. Further, the PSC directly analyzed the home aeration unit (HAU) option. Evidence indicated that the HAU operational alternative was not necessarily feasible because each homeowner would need to obtain a National Pollutant Discharge Elimination System permit, each homeowner would be liable for all sewage, and, when pushed onto the homeowners, still did not solve the sewage issue at hand with the existing Hubbard Heights facility. Still, the PSC did not reject HAUs altogether. It merely concluded that the burden could not be shifted onto the homeowners and would still require CPU involvement. We thus find that the PSC complied with West Virginia Code §

18

24-2H-7(b) in considering alternatives before ordering HSB's acquisition of Hubbard Heights.

### 2. *"Most Suitable" Capable Proximate Utility*

HSB next disputes that it is the most suitable CPU to take on acquisition of Hubbard Heights because (1) other utilities have greater geographic proximity; (2) it has no financial capacity to make the required $4 million capital investment; (3) the City of Huntington was not added as a party, causing logistical difficulties with the acquisition; and (4) the PSC generally failed to consider the criteria outlined in West Virginia Code § 24-2H-5(b).

The PSC recognizes before this Court, as it did below, that the primary issue before it was not whether Hubbard Heights's facilities were failing and in need of acquisition by a CPU, but which CPU could do so when none were "willing to serve." Initially, we observe that West Virginia Code § 24-2H-7(a) contains no explicit statutory criteria for the PSC to consider in determining the "most suitable" CPU for acquisition of a failing utility where more than one CPU has been identified.[36] It simply states that the PSC "may order the acquisition of the failing utility by the most suitable capable proximate

---

[36] For ease of reference, we refer to the other respondent utilities as CPUs even though the record is not clear as to whether the PSC found that other respondent utilities met the statutory criteria of a CPU or whether, of all CPUs, HSB was simply the most suitable. Regardless, our analysis is not altered by it.

19

water or wastewater utility, if there is more than one."[37] The statutory language gives the

PSC broad authority to compel acquisition of a failing utility by whatever CPU it finds to

be "most suitable" and pays no heed to willingness, closest in proximity, nor any other

criteria save the qualifications found in West Virginia Code 24-2H-5(b) for "capable

proximate utilities." So we shift our analysis to the PSC's consideration of HSB as a

qualifying CPU under the statutory criteria outlined in West Virginia Code § 24-2H-5(b),

which provides

> In determining whether a utility is a capable proximate utility, the commission shall consider the following factors:
>
> (1) The financial, managerial, and technical ability of all proximate public utilities providing the same type of service;
>
> (2) Expansion of the franchise or operating area of the acquiring utility to include the service area of the distressed utility;
>
> (3) The financial, managerial, operational, and rate demands that may result from the current proceeding and the cumulative impact of other demands where the utility has been identified as a capable proximate utility; and
>
> (4) Eligibility of the capable proximate utility to receive state grant funding and federal grant funding in a similar manner as the distressed utility; and
>
> (5) Any other relevant matter.

The selection of HSB as the most suitable capable proximate utility is

---

[37] W. Va. Code § 24-2H-7(a).

20

founded on the evidence presented that Hubbard Heights's septic system is draining over the bank, posing a threat to both local and downstream citizens, and so needs remediation. The PSC determined that the cost of remediation would not be dependent on which CPU acquired Hubbard Heights, but rather the remediation plan itself. Finally, the PSC recognized that acquiring Hubbard Heights in its current organizational and operational state would be a substantial burden on any of the potential CPUs. For that reason, much of the PSC's analysis of this statutory criteria is inherently comparative; a matter of which entity is best able to bear the burden.

Relative to the financial ability of HSB, the PSC made findings consistent with the evidence presented that HSB is larger than the other proximate utilities, has the largest number of customers to spread the costs of the acquisition, and has annual revenue of $16 million compared to a combined $4.6 million for the other proximate utilities. While HSB disputes that the PSC could have considered the financial ability of HSB to undertake the project when its exact cost is unknown, as noted above, the remediation plan is not "set," but the PSC heard general evidence of what the cost of the project could be. The statute does not require the PSC to formulate a definitive plan of action with accompanying fiscal note before acquisition is deemed appropriate; it requires only that the PSC consider the potential financial impact. The PSC was within its authority to order HSB to work with PSC staff to formulate a remediation plan, which, as the PSC notes, could include "repairing and reactivating the existing collection system; interconnecting the Hubbard Heights residences to the Huntington collection system; installing a package treatment

21

plant; [or] other viable solutions."

Managerially, HSB has seventy-five employees that include over forty field workers compared to single-digit numbers of employees in other CPUs, providing more administrative support and field personnel for the project. Operationally, the PSC considered that the most likely solution would be to deliver sewer flow to Huntington regardless of whether it was designated as the CPU to acquire Hubbard Heights, and that HSB could provide both treatment and collection services. Moreover, the PSC heard evidence that HSB has five resale customers who could share the cost of the project, four of which are the other CPUs.

To expansion of the operating area, the PSC recognized that each of the CPUs are proximately located to Hubbard Heights; in other words, Hubbard Heights is essentially surrounded by sewer utilities. The ALJ found that HSB's treatment plant was visible from Hubbard Heights and closer than some of the other potential CPUs. Proximity is a consideration, but it is not dispositive in the way HSB argues. CPUs, by definition, are closely situated to the distressed or failing utility and there would be little need to enact the statutory criteria found in West Virginia Code § 24-2H-5(b), if the only analysis necessary is a geographical one.

As far as rate demands, in addition to noting the ability of HSB to spread costs among its higher customer base in addition to its resale customers, the PSC also

22

considered that HSB, unlike some other CPUs, can apply for and receive both state and federal grants. The ALJ further directed PSC staff to assist HSB in identifying and pursuing public funding for the project. While HSB takes issue with the practicalities of pushing the costs of a multi-million-dollar project onto only twenty to thirty Hubbard Heights customers, West Virginia Code § 24-2H-9 contemplates cost recovery mechanisms imposed on both acquired and existing customers, and the PSC accounted for HSB's capability to further spread costs to the other respondent CPUs as HSB's resale customers.

Finally, subsection (5) of West Virginia Code § 24-2H-5(b), provides that the PSC shall consider "any other relevant matter[,]" which is the statutory catch-all to air HSB's grievances with its selection as the most suitable CPU to undertake acquisition of the Hubbard Heights system in the absence of the City of Huntington as a party. HSB argues that requiring it to take on acquisition of Hubbard Heights requires the participation of the City of Huntington through its City Council to approve the capital investment, enact a bond ordinance, and exercise eminent domain to obtain the property on which the Hubbard Heights system is located, since the HOA does not own it, and, in any case, is a nonexistent entity.

We agree that the statutory scheme, as demonstrated by this set of facts, neglects to account for the nuances of organizational and logistical difficulties posed by acquisition of a completely defunct utility by a municipality-owned utility. Still, it would be inconsistent with the plain language and purpose of the Act to remove from CPU

23

consideration all utilities subject to oversight by a public body, or to render defunct utilities ineligible for aid for the reason of it being defunct under an enactment specifically designed to remedy those circumstances. The PSC considered those difficulties associated with the city's approval and participation and still selected HSB as the most suitable CPU to acquire Hubbard Heights with direction that PSC staff assist in navigating those difficulties. While we appreciate the practical concerns HSB raised below, we do not see that the PSC's approach is disallowed by statute or that the statutory framework requires it to solve the organizational and logistical difficulties of the project prior to ordering acquisition. The PSC's order gives detailed and reasoned analysis to each of the enumerated statutory factors, and there is evidence to support its findings. Given the deferential standard of review this Court affords to orders of the Public Service Commission, we affirm.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the October 7, 2024 order of the Public Service Commission.

Affirmed.

24